UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

KWIK TICKET INC., by its 50% owner FLORENCE SHAMAH,

Plaintiff

-against-

LARRY SPIEWAK et al.,

Defendants.

Case No. 20-cv-01201 (FB) (SJB)

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S REQUEST FOR A PRELIMINARY INJUNCTION**

Reed Smith LLP
599 Lexington Avenue
New York, NY 10022
Tel. (212) 521-5400
*Attorneys for Defendants*
*Larry Spiewak and Mindy Spiewak*

## TABLE OF CONTENTS

*Page*

FACTUAL BACKGROUND ........ 6

I. Kwik Ticket Has Been Owned and Operated By Larry Spiewak For The Past Forty Years ........ 6

II. The September 2019 Resolution ........ 7

III. Isaac's Pattern Of Erratic And Destructive Behavior Since October 12, 2019 ........ 8

IV. Kwik Ticket Commenced a State Court Action Against the Shamahs to put a Stop to Isaac's Fraudulent Behavior. ........ 11

V. Florence and Isaac's Allegations of Theft Against Spiewak Are Patently False And Have Already Been Rejected Three Times By State Trial And Appellate Courts. ........ 13

VI. The Shamahs File a Duplicative Federal Court Action, and Seek a TRO, Which Was Denied By Judge Brodie ........ 14

LEGAL STANDARD ........ 15

ARGUMENT ........ 15

I. The Shamahs Have Not Suffered Any Irreparable Harm ........ 15

A. Any Purported Misappropriation Can Be Compensated With Money Damages ........ 15

B. The Shareholder Agreement And Resolution Do Not Give The Shamahs Veto Power Over the Daily Operations of Kwik Ticket ........ 17

C. The Shamahs' Seven Month Delay in Seeking This Injunction Demonstrates that there is No Irreparable Harm ........ 18

II. The Shamah's Injunction is Barred by the Anti-Injunction Act and the Rooker-Feldman Doctrine ........ 21

CONCLUSION ........ 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arby's Inc. v. B&R Mngmt. & Leasing Corp.*,
No. 97-CV-0845, 2000 WL 1335753 (N.D.N.Y. Aug. 31, 2000) ....21, 22

*Caporicci v. Devine*,
No. 15-CV-3559 (FB) (LB), 2015 U.S. Dist. LEXIS 83418 (E.D.N.Y. June 26, 2015) ....5, 19

*Demirayak v. City of New York*,
746 Fed. Appx. 49 (2d Cir. 2018) ....16

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*,
544 U.S. 280 (2005) ....22

*Forest City Daly Hous., Inc. v. Town of North Hempstead*,
175 F.3d 144 (2d Cir. 1999) ....15

*Gen. Textile Printing & Processing Corp. v. Expromtorg Int'l Corp.*,
862 F. Supp. 1070 (S.D.N.Y. 1994) ....16, 18

*Gidatex, S.r.L. v. Campaniello Imports, Ltd.*,
13 F. Supp. 2d 417 (S.D.N.Y. 1998) ....19

*JSG Trading Corp. v. Tray-Wrap, Inc.*,
917 F.2d 75 (2d Cir. 1990) ....16

*MacPherson v. Town of Southampton*,
738 F. Supp. 2d 353 (E.D.N.Y. 2010) ....22, 23, 24

*Marcy Playground, Inc. v. Capitol Records, Inc.*,
6 F. Supp. 2d 277 (S.D.N.Y. 1998) ....21

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*,
883 F.3d 32 (2d Cir. 2018) ....15

*Reuters, Ltd. V. United Press Int'l, Inc.*,
903 F.2d 904 (2d Cir. 1990) ....16

*Rosewood Apartments Corp. v. Perpignano*,
200 F. Supp. 2d 269 (S.D.N.Y. 2002) ....4, 16

*Score, Inc. v. Cap Cities/ABC, Inc.*,
724 F. Supp. 194 (S.D.N.Y. 1989) ....16

*Tough Traveler, Ltd. v. Outbound Prod.*,
60 F.3d 964 (2d Cir. 1995)........................................................................................19, 21

**Statutes**

28 U.S.C. § 2283..........................................................................................................21

Defendants Larry and Mindy Spiewak respectfully submit this memorandum of law in opposition to the request for a preliminary injunction brought by Florence Shamah, and her son and purported agent, Isaac Shamah (collectively, the "Shamahs") in a purported derivative action on behalf of Kwik Ticket, Inc. ("Kwik Ticket").

**PRELIMINARY STATEMENT**

The Shamahs' request for a preliminary injunction is extraordinary for a number of reasons, not the least of which is that it seeks to overturn a forty-year old status quo, and asks this Court to issue a mandatory injunction requiring the Shamahs – passive shareholders in Kwik Ticket – to approve everyday business decisions at Kwik Ticket Inc. The Shamahs' action is based entirely on patently false and unsubstantiated claims that Mr. Spiewak, the long-time president, founder and fifty percent owner of Kwik Ticket, stole from the company. Although the Shamahs shockingly fail to disclose it to this Court, there is a prior pending state court action in which the Shamahs' fictitious allegations have been argued – <u>and rejected</u> – three (3) times, twice by the New York State Supreme Court, Kings County, and once by the Appellate Division, Second Department. The Shamahs' claims have most recently been rejected by Judge Brodie, in the Eastern District of New York. The Shamahs have not presented *any* evidence that justifies reversing these prior court decisions, and the Shamahs' request for a preliminary injunction should be denied.

Kwik-Ticket is a privately held corporation that sells tags, plastic barbs, labels and related materials. Mr. Spiewak founded and is the 50% owner of Kwik Ticket, and the other 50% is owned by a related group of shareholders and family members known as the "Shamah Group." Florence Shamah is a member of the Shamah Group. For forty years, Mr. Spiewak has worked tirelessly building Kwik Ticket into a successful company and has run the daily operations of Kwik

Ticket. The members of the Shamah Group, for that same forty-year period, were passive investors who have had no involvement in the operations of the company.

Notwithstanding this long-time status quo, in September 2019, Isaac Shamah, the son of Florence Shamah, demanded a role in "running" Kwik Ticket. Mr. Spiewak agreed to have discussions with the Shamah Group regarding the future of the company. During this discussion period, Mr. Spiewak briefly permitted Isaac Shamah to come to Kwik Ticket's offices so that Isaac could begin to understand the business and learn what operating a company like Kwik Ticket entailed (as the parties had been discussing a possible sale of the business or a buy-out of each other's shares). Following this brief discussion period, Mr. Spiewak declined to give Isaac a role in the company, largely because of Isaac's disruptive, erratic, and, frankly (as Mr. Spiewak later learned), criminal behavior. Isaac refused to accept this decision, and continued to try to insinuate himself into the business by interfering with Kwik Ticket's operations, it financial providers, its employees and vendors. For example, Isaac Shamah called JP Morgan Chase bank and impersonated Mr. Spiewak in order to gain access to confidential banking records. Isaac Shamah's ruse and identify theft worked (at least temporarily) and, at Isaac's instruction, JP Morgan Chase changed the account information and began sending Kwik Ticket's bank statements to Florence Shamah's house. Isaac also switched Kwik Ticket's payroll vendor, and instructed employees to pay vendors less to "show strength" to suppliers. As Mr. Spiewak learned of these things, and more, he sought to stop Isaac. However, following repeated unsuccessful attempts to convince Isaac to stop his illegal interference with Kwik Ticket, the company was forced to initiate an action against Florence and Isaac Shamah in New York Supreme Court, Kings County (the "State Court Action")

In January 2019, Kwik Ticket obtained a temporary restraining order from the State Court, which enjoined Isaac Shamah from "purporting to act on behalf of Kwik Ticket or representing to others that he is authorized to act on behalf of Kwik Ticket" and "prohibiting [Isaac] from entering Kwik Ticket's office …." Isaac sought to have the TRO dissolved by the Appellate Division, Second Department, making the same failed arguments that he is making here, *i.e.*, that Mr. Spiewak's alleged theft necessitated Isaac's involvement with Kwik Ticket. The Second Department denied the request to dissolve the TRO. Thereafter, the trial court held another lengthy hearing and argument, at which the Shamah's counsel made the identical arguments (even waiving around a copy of the complaint that he has now filed in this action.) Following that hearing, the state court extended the injunction.

Having lost three (3) times in state court with these same frivolous arguments, the Shamahs initiated an action in this Court, apparently hoping that forum shopping and concealing the State Court Action from this Court would bring better results. The Complaint purports to assert claims for civil RICO and common law causes of action, accusing Mr. Spiewak of theft from Kwik Ticket, primarily by issuing checks payable to cash. On March 19, during the pandemic which has crippled the state courts in New York and elsewhere, the Shamahs feigned an "emergency" and made an application for a TRO seeking to enjoin Larry Spiewak, the forty-year President of Kwik Ticket, from making any ordinary business decisions without the prior written consent of "Florence Shamah or her agent, Isaac D. Shamah."

On March 20, following extensive argument during which the Court considered the same arguments that Shamahs have repeatedly raised in the State Court Action, Judge Brodie properly denied the Shamahs' request for a TRO, holding that, at best, this was a shareholder dispute that

could be compensated with money damages, and that there was no irreparable harm. The Court should reach the same result here, and deny the Shamahs' request for a preliminary injunction.

**First**, as Judge Brodie recognized, there is no irreparable harm. The allegations of theft, while demonstrably false, provide no basis for extraordinary injunctive relief because, even if true, alleged theft can be compensated by money damages. The Shamahs attempt to circumvent this obvious bar to their request for an injunction by conclusorily claiming that Mr. Spiewak, -- a successful businessman for forty years -- will not have the ability to pay a damages claim. They, of course, provide no support for that claim and courts are clear that "merely alleging an opponent's inability to pay damages does *not* constitute irreparable harm." *See Rosewood Apartments Corp. v. Perpignano*, 200 F. Supp. 2d 269, 278 (S.D.N.Y. 2002) (emphasis added).

Moreover, despite having unrestricted online access to Kwik Ticket's bank records until January 2020, the Shamah's have only contrived a total of $33,000 in checks allegedly made out to cash in 2018, against revenues of $7.6 million, and $16,000 in 2019, against revenues of $8.2 million. These amounts constitute .004% and .002% of Kwik Ticket's revenues for 2018 and 2019, respectively. It strains credulity that Mr. Spiewak will not have the resources to repay these amounts if these payments were ever to be considered improper -- which, again, Mr. Spiewak categorically denies.

**Second,** the Shamahs claim that the Kwik Ticket Shareholder Agreement requires director approval for company decisions, and they are going to be irreparably harmed at some point in the future by their inability to make such decisions as directors. However, Section 3(c) of the Shareholder Agreement only requires director approval for major company decisions such as mergers, acquisitions, corporate leases, or undertaking substantial new liabilities. The day-to-day

operations are conducted by -- and have been made for the last forty years -- exclusively by Kwik Ticket's President, Mr. Spiewak.

**Third,** the Shamahs' inexplicable delay in seeking this injunctive relief eviscerates their claim of "irreparable harm." Back in August 2019 (*i.e.*, seven months ago), the Shamahs' attorney sent a letter to Mr. Spiewak making the same baseless theft accusations, and demanding the same ridiculous relief. The Shamahs, however, did not take any action until March 2020, nearly seven months later, and only after the Shamahs lost three times (3) in state court with the same recycled – and rejected – arguments that have been made for the better part of a year. This delay in seeking relief "undermines the necessity of a preliminary injunction." *Caporicci v. Devine,* No. 15-CV-3559 (FB) (LB), 2015 U.S. Dist. LEXIS 83418, at *1 (E.D.N.Y. June 26, 2015) (Block, J.) (denying preliminary injunction based on plaintiff's two (2) month delay).

**Finally,** the Shamahs request for an injunction is barred by the Anti-Injunction Act and the Rooker Feldman doctrine. The court in the State Court Action has previously enjoined Isaac Shamah's involvement in Kwik Ticket. That TRO, as noted above, was appealed to the Second Department (and remained in place) and was again extended by Judge Martin following a lengthy hearing before that state court. The Shamahs' request for an injunction mandating Isaac's involvement in Kwik Ticket's operations is an injunction of the state court decision, and violates the Anti-Injunction Act. It also violates the Rooker-Feldman doctrine, which bars a state-court loser from running to federal court and seeking, what is essentially, an appeal of the state court decision.

For these reasons, and as discussed below, the Court should deny the Shamahs' request for a preliminary injunction.

## FACTUAL BACKGROUND

### I. Kwik Ticket Has Been Owned and Operated By Larry Spiewak For The Past Forty Years

Kwik Ticket, Inc. was founded by Larry Spiewak forty years ago, and since that time, it has become a very successful business. *See* Declaration of Larry Spiewak dated March 26, 2020 (the "Spiewak Decl."), at ¶¶ 2, 5**.** In 2018, Kwik Ticket had approximately $7.6 million in revenues; in 2019, it had approximately $8.2 million. *Id*. at ¶ 5.

From the beginning, Spiewak served as President of the company and as guarantor and signatory for its lines of credit and tax returns. *Id*. at ¶¶ 3-4. At its inception, several members of the Shamah family, known as the "Shamah Group," became passive investors in Kwik Ticket, however Spiewak primarily interacted with David Shamah, the patriarch of the family. *Id*. at ¶ 2. The Shamahs have never been involved in running or managing the daily operations of the company. *Id*. at ¶ 6. Conversely, Spiewak has worked tirelessly over the last forty years to grow Kwik Ticket from an idea, into the successful company that it is today, without the help or input of any of the Shamahs. *Id*. at ¶ 7. During this time, the Shamahs have always been content with the way in which Spiewak operated Kwik Ticket, as they were the beneficiaries of the considerable returns resulting from Spiewak's hard work and success. *Id*. at ¶ 8.

When David Shamah passed away approximately eighteen years ago, his shareholder distributions were made to his widow, Florence Shamah ("Florence"). *Id*. at ¶ 9. Florence requested that both she and David's shares of Kwik Ticket's profits be distributed as W-2 income to her and her children, including her son Isaac Shamah ("Isaac"). *Id*. at ¶ 10. Although this distribution was in the form of a W-2, Florence and her children –including Isaac – did not work for Kwik Ticket in any capacity whatsoever. *Id*. In fact, Florence, like her husband, did not take an active role in Kwik Ticket and was merely a passive owner of her shares. *Id*. at ¶ 9.

Similarly, her son Isaac did not serve as an officer, director, manager or employee of the company, nor did he hold an administrative role. *Id.* at ¶ 11. Rather, his role within Kwik Ticket was limited to that of the child of a shareholder. *Id.*

## II. The September 2019 Resolution

In 2017, the IRS audited Kwik Ticket and concluded that it was impermissible to pay Florence's children through a W-2. *Id.* at ¶ 12. Kwik Ticket reached a settlement with the IRS in August 2019 (the "IRS Settlement"), and one month later, Isaac – purporting to act as Florence's agent – asked Spiewak if he could spending time learning the business. *Id.* at ¶¶ 12-13. Around this same time, the Shamahs' counsel prepared a shareholder's resolution (the "Resolution") that was supposed to approve the IRS Settlement. *Id.* at ¶ 14. However, the draft Resolution went much further, and sought to grant Isaac certain rights regarding Kwik Ticket for thirty (30) days. *Id.* Spiewak's attorney rejected the Resolution drafted by the Shamahs' attorney. *Id.* Instead, Spiewak's attorney sent the Shamahs' attorney a revised Resolution limited to the IRS Settlement, as the parties' discussed. *Id.* The Shamahs' attorney acknowledged receipt of the revised resolution and stated that he understood that Spiewak would not sign the draft that he prepared. *Id.*

Notwithstanding, Isaac and his attorney gave Spiewak the Resolution, claimed that it was approved by Spiewak's attorney, and asked him to sign it. *Id.* at ¶ 15. Despite Spiewak's attorney's express written rejection of the Resolution, Spiewak signed the Resolution, mistakenly believing that he could trust Isaac because he and the Shamahs had been friends and business partners for forty years. *Id.* at ¶ 15. However, Spiewak soon uncovered how deceitful Isaac, the Shamahs and their attorney had been.

The Resolution prepared by the Shamahs' counsel temporarily (1) granted the Shamahs online access to Kwik Ticket's books and records and (2) allowed the Shamahs to use and occupy office space at Kwik Ticket but for a period of only 30 days. *Id*. at ¶ 16. Specifically, the Resolution, *by its own terms* expired on October 12, 2019, at which time Kwik Ticket's shareholders' rights, even if that Resolution had not been the product of fraud, reverted back to the prior status quo (which had been the status quo for 40 years). *Id*.

**III. Isaac's Pattern Of Erratic And Destructive Behavior Since October 12, 2019**

Even after the expiration of the fraudulently obtained Resolution (on October 12, 2019, more than five months ago), Isaac continued to interfere with Kwik Ticket's affairs and operations. *Id*. at ¶ 17. For example, Spiewak learned that Isaac was introducing himself as the CEO and CFO of Kwik Ticket to customers and vendors, and signing documents as "Kwik Ticket's CEO", even though he is not, and never was, an officer, director, manager, or even a full time, titled employee of Kwik Ticket. *Id*. at ¶ 18. Even worse, Isaac impersonated Spiewak and called Chase Bank in order to change Kwik Ticket's address for Kwik Ticket's credit card statement from Kwik Ticket's business address, to Florence's home address. *Id.* at ¶ 19, Ex. 1. Kwik Ticket's bookkeeper and Spiewak were the only individuals who ever had authority over Kwik Ticket's business accounts. *Id.* at ¶ 20. Isaac therefore lied to a federally chartered bank in order to misdirect confidential corporate financial information. *Id.* Upon learning of this unauthorized fraud, Spiewak immediately instructed the bank that Kwik Ticket's statements must be delivered to its business address. *Id.*

Additionally Isaac, without any authority or permission from Spiewak whatsoever, engaged in numerous fraudulent and egregiously deceitful acts.

(1) Isaac changed Kwik Ticket's payroll processing company, in an attempt to circumvent the IRS determination that he could not be on Kwik Ticket's payroll. *Id.* at ¶ 21. As a result of Isaac's unauthorized action, Kwik Ticket failed to make timely payroll for two consecutive pay periods to its employees -- for the first time in Kwik Ticket's forty-year history. *Id.*

(2) Isaac purported to promote Kwik Ticket employee Isaac Betesh's – Isaac Shamah's brother in law -- from salesman (which he was for 25 years) to office manager, all to the detriment of Kwik Ticket. *Id*. at ¶ 24.

(3) Isaac purported to hire new employees, including a warehouse employee at an exorbitant six-figure salary. *Id*. at ¶ 23. These individuals now believe that they are employed by Kwik Ticket, but their hiring was completely invalid. *Id*.

(4) Isaac purported to fire Kwik Ticket's longtime bookkeeper, Malky Jacobovits ("Jacobvits"), and removed Jacobovits from Kwik Ticket's payroll, insurance and benefits, exposing Kwik Ticket to potential liability for a wage claim, among others. *Id*. at ¶ 22**.** Isaac also removed certain unspecified documents and items from Jacobvits' desk, which belonged to Kwik Ticket, without permission. *Id*.

(5) Isaac directed Kwik Ticket's employees to underpay Kwik Ticket's vendors by 2% across the board for, as a stated, "show of strength." *Id*. at ¶ 25. Of course, all that did, was create payment liabilities for Kwik Ticket and harm long standing relationships with vendors that Kwik Ticket relies upon to conduct business. *Id*.

(6) Isaac instructed employees to perform activities outside of their job descriptions and to come to work on the weekend, not for Kwik Ticket related work but to "clean" the office as if they were a cleaning service. *Id*. at ¶ 27.

(7) Isaac installed a combination lock on the conference room at Kwik Ticket's office, locked the door, and began to use it for unknown activities. *Id.* at ¶ 28. Spiewak told Isaac that he was not permitted to use the conference room as his office and instructed that the lock be removed, but he continued to do so and refused to remove the lock. *Id.*

(8) Isaac arranged a meeting with Kwik Ticket's pension company, Robin Weingast & Associates, and shockingly told Kwik Ticket's employees that Spiewak was not permitted to attend the meeting, and that Isaac would call the police if he did – this despite the fact that Spiewak is the *only* trustee of Kwik Ticket's pension fund. *Id.* at ¶ 31. Nonetheless, Spiewak learned of the meeting and attempted to attend, but Isaac changed the time of the meeting without his knowledge. ***Id.*** After the meeting, Spiewak contacted Ms. Weingast and informed her that Isaac had no authority to act on behalf of Kwik Ticket, for which she apologized and informed Spiewak that Isaac informed her that he was Spiewak's "equal partner" in the business. *Id.*

(9) In or around June 2019, Florence requested that Kwik Ticket lease her a car, a request that Spiewak denied. *Id.* at ¶ 30. Despite this denial, Isaac leased a Cadillac for Florence purportedly on behalf of Kwik Ticket, and added Florence's Cadillac to Kwik Ticket's insurance. *Id.* However, it is blatantly obvious that Isaac, not Florence is using the vehicle. *Id.* Florence is 86 years old and Spiewak has not seen her drive a car for many years. *Id.*

(10) On or about December 23, 2019, Spiewak ordered approximately 2,000 custom packing ticketing guns from China and requested that the manufacturer airfreight the packing guns when production was complete to fulfill back orders for some of Kwik

Ticket's best clients. *Id.* at ¶ 32. Isaac, without Spiewak's knowledge or permission, contacted Kwik Ticket's freight forwarder, C.H. Robinson, and instructed them to send the order by ocean freight instead. Isaac's unilateral decision was detrimental to the company as it delayed the delivery considerably. *Id.* As a result, Kwik Ticket was unable to timely receive the order by airfreight and the goods were not expected to arrive until the end of February due to Chinese New Year celebrations. *Id.* Due to Isaac's misrepresentations and fraudulent actions, Spiewak had to explain to Kwik Ticket's best customers that their orders would be six weeks late. *Id.* The delay of the order, caused by Isaac, was also extremely damaging to Kwik Ticket's carefully and long-cultivated reputation of excellent customer service. *Id.*

Due to Spiewak's relationship with the Shamah family for forty years, Spiewak made every effort to stop Isaac from committing these, and other, obstructive, interfering and, frankly, criminal activities. *Id.* at ¶ 29. Spiewak regularly instructed Isaac to leave Kwik Ticket's premises, and that he was not permitted to take any action on behalf of Kwik Ticket. *Id.* This culminated in Spiewak's attorney sending a letter to the Shamahs' attorney demanding that Isaac stop interfering with Kwik Ticket. *Id.* at ¶ 34, Ex. 2. However, Isaac ignored all of Spiewak's directives, and refused to stop representing himself as an officer of Kwik Ticket, or to stop taking actions that are designed to destroy the company that Spiewak has spent the last forty years building. *Id.* at ¶¶ 29, 33.

## IV. Kwik Ticket Commenced a State Court Action Against the Shamahs to put a Stop to Isaac's Fraudulent Behavior.

On January 15, 2020, Kwik Ticket through its counsel, commenced an action against Isaac and Florence Shamah (the "State Court Action") in the Supreme Court of the State of New

York, Kings County, titled *Kwik Ticket Inc. v. Isaac Shamah and Florence Shamah*, and bearing the Index No. 501076/2020. *Id*. at ¶ 35.

On the same day, Kwik Ticket sought a temporary restraining order ("TRO") and preliminary injunction in the State Court Action, enjoining Isaac from (i) purporting to act on behalf of Kwik Ticket or representing to others that he is authorized to act on behalf of Kwik Ticket and (ii) prohibiting Isaac from entering Kwik Ticket's business office. *Id*. at ¶ 36, Ex. 3**.**

On January 15, 2020, the Honorable Justice Larry D. Martin of the Supreme Court of New York, Kings County, granted the TRO. *Id*. at ¶ 37; Ex. 3. However, even the State Court TRO *still* did not deter Isaac. *Id*. at ¶ 38. On January 16, 2020, the very next day, after he was served with the TRO, Isaac knowingly and intentionally violated the State Court TRO by accessing a Kwik Ticket bank account to transfer $15,300 from Kwik Ticket's account to pay his children's tuition at the Magen David School in Brooklyn. *Id*., Ex. 4**.** For good measure, on the same day, Isaac again knowingly and intentionally violated the State Court TRO and charged nearly $1,000 in Knick's basketball tickets to the company credit card. *Id*. at ¶ 39, Ex. 5**.**

In an attempt to get yet another bite at the apple, the Shamahs then filed an "emergency" appeal of the state court TRO to the Appellate Division, Second Department. *Id*. at ¶ 40. Following extensive argument, where the Shamahs made the identical arguments that they make here, *i.e,* that Isaac needs to be involved with Kwik Ticket because of Spiewak's purported theft, and with the identical "evidence" presented here, the Appellate Division denied the Shamahs' appeal on January 22, 2020, leaving the State Court TRO in place. *Id.*, Ex. 3.

More than a month later, on February 26, 2020, following another lengthy argument before Justice Martin in Kings County, where the Shamahs yet again raised these fabricated allegations of theft, the court extended the TRO. *Id*. at ¶ 41, Ex. 6. The state court also granted

Kwik Ticket leave to amend the complaint in order to add a count for the dissolution of Kwik Ticket noting that the partnership was clearly at an end and the company must be dissolved. *Id*. at ¶ 42.

### V. Florence and Isaac's Allegations of Theft Against Spiewak Are Patently False And Have Already Been Rejected Three Times By State Trial And Appellate Courts.

Throughout the State Court Action, Isaac, purportedly on behalf of Florence, has repeatedly and continuously claimed (albeit falsely) that he needed to be involved in the operations of Kwik Ticket, because Spiewak was allegedly stealing from the company. *Id*. at ¶ 43. However, the state trial and appellate courts have now rejected those arguments *three separate times*. *Id*.

The Shamahs base their allegations of theft primarily on the fact that certain Kwik Ticket checks were made out to cash. *Id*. at ¶ 44. These checks comprise a mere fraction of Kwik Ticket's revenues. *Id*. at ¶ 45. In 2018, the Shamahs identified $33,329 in checks made out to cash, which constitutes less than one half of one percent of Kwik Ticket's $7,600,000 in revenues that year. *Id*. In 2019, they identified $16,138 in checks made out to cash, against $8,200,000 in revenues, representing less than .002%. *Id*. Cash expenditures of .002% - .005% of total revenues is completely ordinary, particularly for a local business that relies on many other small business vendors for its needs. *Id*. at ¶ 47. Further, the Shamahs had unrestricted online access to Kwik Ticket's bank records until January 2020, and their lawyer has been making these unsubstantiated theft allegations since August 2019. *Id*. at ¶ 46. Therefore, it is fair to assume that the "evidence" of cash payments they presented to the Court, and attached to the Complaint, represents the sum total of their concocted fraud case against Spiewak. *Id.*

### VI. The Shamahs File a Duplicative Federal Court Action, and Seek a TRO, Which Was Denied By Judge Brodie

On March 4, 2020, after losing three times in state court, the Shamahs initiated the present action, asserting RICO and common law causes of action based on the same shareholder dispute that is being litigated in state court. Dkt. No. 1.

On March 19, 2020, despite the complete absence of any changed circumstances that would necessitate emergency relief, the Shamahs filed an application for a TRO and a preliminary injunction, seeking a mandatory injunction requiring the Shamahs' approval for Kwik Ticket's daily business operations. Dkt. No. 10.

The following day, on March 20, 2020, Judge Brodie heard argument on the TRO, and denied the Shamahs' request for a TRO. *See* March 20, 2020 Transcript of Civil Cause for Temporary Restraining Order Before the Honorable Margo K. Brodie (the "TRO Hearing Transcript"), Spiewak Decl., Ex. 7.

Judge Brodie first held that the Shamahs were seeking a mandatory injunction that disrupted the status quo, and therefore, were subject to the higher standard for a mandatory injunction. *See* TRO Hearing Transcript at 35. ("Here I find that plaintiff is asking for a mandatory injunction; in effect, plaintiff is not asking me to maintain the status quo but rather to change it. And by asking me to alter the status quo, in effect, asking me to impose as a condition that were previously imposed by the resolution, plaintiff needs to meet the heightened standard.").

Judge Brodie further held that the Shamahs failed to meet this heightened standard and in particular, could not demonstrate irreparable harm. *Id.* ("As I indicated earlier, to the extent that plaintiff is challenging and arguing that defendants are, in effect, stealing money from the company and is worried about the manner in which the company is being run, that can all be

remedied at the end of this lawsuit by monetary damages. And as we are all aware, irreparable harm is the single most important prerequisite for the issuance of injunctive relief.)

On this basis, Judge Brodie denied the Shamahs' request for a TRO. *Id.* ("And because plaintiff cannot show irreparable harm, plaintiff is not entitled to a TRO, and I am denying it.").

## LEGAL STANDARD

To obtain a preliminary injunction, a plaintiff must establish: (1) that he or she will be irreparably harmed if the injunction is not granted; and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of the claims to make them a fair ground of litigation, and a balance of hardships tipping decidedly in plaintiff's favor. *Forest City Daly Hous., Inc. v. Town of North Hempstead*, 175 F.3d 144, 149 (2d Cir. 1999).

Where a party seeks a mandatory injunction, which disrupts the status quo, the movant must meet a heightened legal standard by showing "a clear or substantial likelihood of success on the merits." *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018). Here, as Judge Brodie recognized at the TRO hearing on March 20, the Shamahs are seeking to disrupt a forty-year status quo, and are therefore subject to the more stringent mandatory injunction standard. As discussed below, the Shamahs do not meet *either* standard, and their request for an injunction should be denied.

## ARGUMENT

### I. The Shamahs Have Not Suffered Any Irreparable Harm

#### A. Any Purported Misappropriation Can Be Compensated With Money Damages

While false at its core, even if true, the Shamahs' claim that Mr. Spiewak misappropriated funds from Kwik Ticket is the quintessential harm that can be compensated with money damages, and does not constitute irreparable harm. Irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Demirayak v. City of New York*, 746

Fed. Appx. 49, 51 (2d Cir. 2018). In establishing irreparable harm, a plaintiff must demonstrate that there is a threat of actual injury for which available legal remedies are inadequate. *See Score, Inc. v. Cap Cities/ABC, Inc.*, 724 F. Supp. 194, 198 (S.D.N.Y. 1989). "Where money damages are adequate compensation a preliminary injunction should not issue." *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990). Moreover, "[i]rreparable harm must be shown by the moving party to be imminent, not remote or speculative." *Reuters, Ltd. V. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990).

The Shamahs' chief complaint rests on the bald – and completely false – assertion that Mr. Spiewak misappropriated funds from Kwik Ticket, primarily by issuing certain checks to cash. *See* Pls.' Mot. at 1-2, 5. In attempting to cobble together an "irreparable harm" based on these purported monetary damages, the Shamahs speculate that "there is no evidence that any of the defendants will have the money to repay the corporation the millions of dollars stolen." *Id.* at ¶ 7. However, it is well-established that "merely alleging an opponent's inability to pay damages does not constitute irreparable harm." *See Rosewood*, 200 F. Supp. 2d at 278; *accord Gen. Textile Printing & Processing Corp. v. Expromtorg Int'l Corp.*, 862 F. Supp. 1070, 1075 (S.D.N.Y. 1994) (plaintiff's claim that "defendant will be unable to satisfy a money judgment" is not "sufficient to establish irreparable injury.").

The absurdity of the Shamahs' argument that Mr. Spiewak will be unable to satisfy a judgment is highlighted if the Court moves past the Shamahs' heated rhetoric of stolen "millions," and examines the actual "evidence" submitted by the Shamahs. Despite accusing Mr. Spiewak of theft in August 2019, and having unrestricted online access to Kwik Ticket's bank records until January 2020, the Shamah's have only identified a purported $33,000 in checks at issue for 2018, and $16,000 for 2019.

In 2018, Kwik Ticket had approximately $7.6 million in revenue, so the $33,000 in checks made out to cash represent less than one half of one percent of company revenues. In 2019, Kwik Ticket revenues were approximately $8.2 million, so the $16,000 in checks represent only .0019 of company revenues. It strains credulity that Mr. Spiewak will not have the resources to repay these amounts, which constitute .004% and .002% of Kwik Ticket's revenues, respectively.[1]

### B. The Shareholder Agreement And Resolution Do Not Give The Shamahs Veto Power Over the Daily Operations of Kwik Ticket

The Shamahs' second argument in support of irreparable harm is that on March 17, 2020, two days before making this application, they signed a document purporting to appoint themselves as directors of Kwik Ticket, and that the Shareholders' Agreement requires director approval for company decisions. They further claim that Mr. Spiewak signed a Shareholder Resolution in September 2019 that gave Isaac Shamah some role in Kwik Ticket for thirty days. These arguments fail for the following reasons.

**First,** setting aside that the Shareholder Agreement has not been observed by the any of the shareholders of Kwik Ticket during its forty year existence, Section 3(c) of the Shareholder's Agreement only requires director approval for "major changes in the business of the corporation" such as "increasing the purchase commitments by 20% or more," "merging with or acquiring another corporation" or similar major decisions. *See* Dkt. No. 12-2. The mandatory injunction sought by the Shamahs goes far beyond these circumstances, and would require the Shamahs' written approval for Kwik Ticket's daily business activities, such as before "making any payment on behalf of Kwik Ticket Inc., by check, wire transfer" *See* Dkt. 10. The injunction would also grant the Shamahs "on-line access to all Kwik Ticket bank accounts, payroll accounts, and credit

[1] It should also be noted that cash expenditures of .002% - .004% of total revenues could not, in good faith, be argued is out of the ordinary, particularly for a local business that relies on many other small business vendors for its operational needs.

cards." *Id.* The Shareholder Agreement does not require director approval for such daily management of the Company, and therefore, it cannot serve as the basis for the Shamahs' injunction. What the Shamahs are improperly asking this Court to do is to re-write a forty-year-old shareholder agreement because Isaac Shamah wants a job.

**Second,** and the more troubling part of the "Shareholder Resolution" argument, is that the Shareholder Resolution was the result of a fraud by Isaac Shamah and could never serve as the basis for a preliminary injunction. *See* Spiewak Decl. ¶¶ 14-15. However, even if valid (which it is not), that Resolution expired five (5) months ago on October 12, 2019. *See* Dkt. 1-13. Following the discussion period, Mr. Spiewak declined to give Isaac Shamah a role in Kwik Ticket, finding him disruptive and frankly unqualified to be involved with Kwik Ticket because he lacked the temperament and business knowledge to successfully operate a company such as Kwik Ticket. In the following months, Isaac continued to try to force his way into Kwik Ticket and began pretending that he was the CEO and CFO of Kwik Ticket and the other misdeeds set forth in Mr. Spiewak's declaration. As a result, Kwik Ticket was left with no choice but to seek and obtain the State Court TRO barring Isaac Shamah's involvement in Kwik Ticket.

In sum, neither the Shareholder Agreement nor the purported Resolution allow the Shamahs to exercise daily control over Kwik Ticket, and cannot serve as the basis for their argument that they are irreparably harmed absent such interference and control of the day to day operations.

### C. The Shamahs' Seven Month Delay in Seeking This Injunction Demonstrates that there is No Irreparable Harm

The Shamahs' request for a preliminary injunction should also be denied because they delayed seeking injunctive relief until March 19, 2020, despite knowing of the purported harm since at least August 2019.

A "presumption of irreparable harm is inoperative if the plaintiff has delayed either in bringing suit or in moving for preliminary injunctive relief." *Tough Traveler, Ltd. v. Outbound Prod.*, 60 F.3d 964, 968 (2d Cir. 1995). This is "because the failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Id.* "Courts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months." *Gidatex, S.r.L. v. Campaniello Imports, Ltd.,* 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998); *see also Caporicci,* 2015 U.S. Dist. LEXIS 83418, at *1 (Block, J.) (denying preliminary injunction based on plaintiff's two (2) month delay).

Here, on August 30, 2019, the Shamahs' counsel wrote a letter to Mr. Spiewak titled "Theft from Kwik Ticket." Dkt. No. 1-12. In that letter, the Shamahs' counsel posited the same false allegations of theft, and made the same demand for veto rights over the day-to-day operations of Kwik Ticket. *Id.* Yet, the Shamahs did not file the Complaint until March 4, 2020, and did not seek injunctive relief until March 19, 2020, nearly seven (7) months after their demand letter. Nor did the Shamahs file the Complaint until after they were sued in the Pending State Court Action and until after the trial judge and the Second Department issued three (3) separate order restraining Isaac Shamah – all after hearing these same nonsense arguments about theft and rejecting those arguments.

The Shamahs will likely argue that there was no need to obtain injunctive relief because the September 2019 shareholders' resolution that Isaac Shamah fraudulently induced Mr. Spiewak to sign gave the Shamahs the control they sought. *See* Dkt. 1-13. However, as set forth above, and in Mr. Spiewak's affidavit, even if that resolution was not the product of fraud, it expired by

its own terms on October 12, 2019, yet the Shamahs did not file an action or seek injunctive relief at that time either.

The Shamahs claim that Mr. Spiewak allowed Isaac Shamah to continue his involvement with Kwik Ticket for several months after the expiration of the shareholders' resolution, but the facts belie this assertion. Instead, during this period, Isaac Shamah began pretending to be the CEO and CFO, impersonating Mr. Spiewak to financial institutions, and purported to act on behalf of Kwik Ticket notwithstanding Mr. Spiewak's vociferous and repeated objections when he learned of Isaac Shamah's actions. *See* Spiewak Decl. ¶¶ 18-34.

The Shamahs' stated need for injunctive relief was still not urgent on January 14, 2020, when Kwik Ticket sued the Shamahs, and sought and obtained a TRO enjoining Isaac Shamah's involvement with the company. This should have made it abundantly clear that Mr. Spiewak would not allow the Shamahs to interfere with or exercise control over the day-to-day operations of the business but, yet, the Shamahs still did not sue or seek any form of injunctive relief. Instead, they waited two (2) more months, after losing three (3) times in state court. It was only after these unfavorable decisions in state court that the Shamahs' initiated this meritless federal court action, apparently hoping that the change of forum and concealment of the State Court Action would bring better results.

Taken together, it is incontestable that the Shamahs knew of the purported harm since August 2019, yet failed to seek an injunction in federal court until they suffered a string of losses over several weeks in two different state court forums. This unexcused delay undermines their assertion of irreparable harm, and is further grounds for denying their request for a preliminary injunction. *See Tough Traveler, Ltd.*, 60 F.3d at 968 (reversing trial court injunction on grounds that plaintiff's four month delay in seeking injunctive relief demonstrated a lack of irreparable

harm); *Marcy Playground, Inc. v. Capitol Records, Inc.*, 6 F. Supp. 2d 277, 281 (S.D.N.Y. 1998) (denying preliminary injunction; three month delay in seeking injunctive relief demonstrated lack of irreparable harm).

**II. The Shamah's Injunction is Barred by the Anti-Injunction Act and the Rooker-Feldman Doctrine**

Additionally, the Shamahs' request for a mandatory injunction requiring their involvement in Kwik Ticket's daily operations would be a *de facto* injunction of the State Court injunction barring Isaac Shamah's involvement with Kwik Ticket, and is therefore barred by the Anti-Inunction Act and the Rooker-Feldman doctrine.

The Anti-Injunction Act, 28 U.S.C. § 2283, bars a federal court from granting an injunction which has the effect of enjoining state court proceedings, subject to three exceptions not relevant here. The Anti-Injunction Act has "four distinct elements. [] (i) a court of the United States (ii) may not grant an injunction (iii) to stay proceedings (iv) in a State court." *Arby's Inc. v. B&R Mngmt. & Leasing Corp.,* No. 97-CV-0845, 2000 WL 1335753, at *4 (N.D.N.Y. Aug. 31, 2000). "Although the Act speaks in terms of prohibiting injunctions staying state court proceedings, the Act's prohibitions apply equally to injunctions against both the state court itself and to injunctions against litigating parties." *Id.* In *Arby's*, the federal court plaintiff was subject to a state court TRO barring Arby's from terminating B&R's franchise. *Id.* Arby's subsequently sought a federal court injunction barring B&R from using the Arby's trademark. *Id.* The Court held that Arby's federal court TRO had the effect of interfering with the state court TRO, and was barred by the Anti-Injunction Act. *Id.*

Here too, the Shamahs seek a mandatory injunction requiring Mr. Spiewak to, among other things, obtain the written consent of "Florence Shamah or her agent, Isaac D. Shamah" before "making any payment on behalf of Kwik Ticket Inc., by check, wire transfer" or "making or

implementing any decision on behalf of Kwik Ticket Inc. (other than routine, day-to-day decisions) without the consent of Florence Shamah or her agent, Isaac D. Shamah . . . ." *See* Dkt. 10. The State Court, on the other hand, has already enjoined Isaac Shamah from involving himself with Kwik Ticket in any way, purporting to act on Kwik Ticket's behalf, or even to enter its offices. Spiewak Decl., Exs. 3, 6**.** This injunction does not distinguish between situations where Mr. Shamah is acting on his own behalf, or where he purports to act on behalf of his mother or someone else – it categorically bars Isaac Shamah's involvement with Kwik Ticket. A federal court injunction mandating his involvement interferes with the State Court injunction, and is therefore barred by the Anti Injunction Act. *See Arby's Inc.*, 2000 WL 1335753, at *4 (relying on Anti-Injunction Act in declining to issue injunction that interfered with state court injunction).

The Shamahs' injunction is also barred by the Rooker-Feldman doctrine which prevents federal court action in "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). "Under the *Rooker–Feldman* doctrine, 'federal district courts lack jurisdiction to review state court decisions whether final *or interlocutory* in nature.'" *MacPherson v. Town of Southampton*, 738 F. Supp. 2d 353, 363 (E.D.N.Y. 2010) (quoting *Gentner v. Shulman,* 55 F.3d 87, 89 (2d Cir.1995)).

Here, the Shamahs are three-time State Court losers: (1) a TRO was entered against them on the facts before the New York State Supreme Court, (2) they lost the "emergency" appeal they brought in the Second Department, and (3) they lost the subsequent hearing in the trial court, where Justice Martin extended the TRO after hearing – and rejecting – the same arguments by the Shamahs about purported theft. Only following that string of losses did the Shamahs initiate this

action, and ask the federal court to review and, for all intents and purposes, reverse these State Court injunctions. This is a textbook federal appeal of a state court decision that is barred by Rooker-Feldman. *See MacPherson*, 738 F. Supp. 2d 353 at 361-63 (E.D.N.Y. 2010) (Rooker Feldman doctrine barred federal plaintiff from obtaining federal injunction that would have the effect of enjoining a prior state court TRO).

The Shamahs will likely argue, as they did before Judge Brodie, that the state and federal actions are completely unrelated because Isaac Shamah was a defendant is the state action, but is not a plaintiff in this action. This casuistic distinction completely ignores that, *in this federal action*, the Shamahs are seeking an injunction which would mandate Isaac Shamah's involvement with Kwik Ticket. It is immaterial that Isaac claims to be acting as Florence's agent, because the state court barred his involvement in all circumstances – whether he is acting on his own authority or on behalf of someone else.[2]

If there was any doubt about the Shamahs' intentions with respect to Isaac's involvement with Kwik Ticket, they were made abundantly clear by the Notice of Designation of Directors signed by Isaac Shamah on March 17, 2020 – two days before seeking the injunction. *See* Dkt. 12-3. This document, which while not served on the company but which the Shamahs helpfully attached to their motion, states that the Shamah Group purports to appoint Florence and Isaac Shamah as directors of Kwik Ticket, and Isaac Shamah alone is designated as the "spokesman of the Shamah Group." *Id.* Setting aside whether this Notice has any legal effect, it clearly reveals that the Shamahs are using this federal court injunction to achieve what the state court has already enjoined them from doing – *i.e.*, Isaac's involvement in Kwik Ticket. Such a federal court

[2] Further, as Mr. Shamah argued in the Pending State Court Action before Judge Martin: "Isaac Shamah is Florence Shamah, and Florence Shamah is Isaac Shamah" for all purposes related to Kwik Ticket. Therefore, while Mr. Shamah may suggest that some other "agent" for Florence could be appointed, he has already made clear that he and Florence are one in the same when it comes to whatever passive interest she may own in Kwik Ticket.

injunction is barred by the Anti-Injunction Act and the Rooker Feldman doctrine, and must be denied. *Id.*

## CONCLUSION

The Shamahs have not established any of the elements for a preliminary injunction, let alone the heightened standard required to disrupt the forty-year old status quo at Kwik Ticket. For these reasons, the Spiewaks respectfully request that the Court deny the Shamahs request for a preliminary injunction, along with such other relief as the Court deems just and equitable.

Dated: New York, New York
March 26, 2020

By: *__/s/ Samuel Kadosh__*
Joseph Tuso*
Samuel Kadosh
Reed Smith LLP
599 Lexington Avenue
New York, NY 10022
Tel. (212) 521-5400
Fax. (212) 521-5450
*Attorneys for Defendants*
*Larry Spiewak and Mindy Spiewak*

* *pro hac vice pending*