1

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2
     ------------------------------x
3                                            20-CV-1201(FB)
     KWIK TICKET INC.,
4                                            United States Courthouse
            Plaintiff,                       Brooklyn, New York
5
            – versus –                       March 20, 2020
6                                            2:00 p.m.
     LARRY SPIEWAK, et al.,
7
            Defendants.
8
     ------------------------------x
9

10     TRANSCRIPT OF CIVIL CAUSE FOR TEMPORARY RESTRAINING ORDER
              BEFORE THE HONORABLE MARGO K. BRODIE
11               UNITED STATES DISTRICT JUDGE

12
     APPEARANCES
13
     Attorney for Plaintiff:  MATALON PLLC
14   Florence Shamah          450 Seventh Avenue
                              33rd Floor
15                            New York, New York 10123
                              BY:  JOSEPH LEE MATALON, ESQ.
16                                   (Via teleconference)

17
     Attorney for Plaintiff:  GOLDBERG RIMBERG & WEG PLLC
18   Kwik Ticket Inc.         122 West 27th Street
                              New York, New York 10001
19                            BY:  STEVEN A. WEG, ESQ.
                                   (Via teleconference)
20

21   Attorney for Defendants: REED SMITH LLP
     Larry Spiewak           599 Lexington Avenue
22   and Mindy Spiewak       New York, New York 10022
                             BY:  SAMUEL KADOSH, ESQ.
23                                JOSEPH J. TUSO, ESQ.
                                   (Via teleconference)

24

25

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

2

1    APPEARANCES (CONTINUED)

2

3    Attorney for Defendant:  HIRSCHEL LAW FIRM, PC
     Malkah Jacobovits      71 South Central Avenue
                            Suite 103
4                           Valley Stream, New York 11580
                            BY:  DANIEL ETHAN HIRSCHEL, ESQ.
5                                  (Via teleconference)

6

     Also Present:          VICTOR DIDIA, ESQ.
7

8    Court Reporter:        LINDA D. DANELCZYK, RPR, CSR, CCR
                            Phone:  718-613-2330
9                           Fax:    718-804-2712
                            Email:  LindaDan226@gmail.com
10

11

12   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.
13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS                           3

1              (In open court.)

2              THE COURT:  Okay, can you call the case, please,

3    Winnie.

4              THE COURTROOM DEPUTY:  Yes, Judge.

5              Civil cause for a TRO, Docket Number 20-CV-1201.

6              Counsel, please state your name for the record,

7    starting with plaintiff.

8              MR. MATALON:  For the plaintiff it's Joseph Lee

9    Matalon of the Law firm Matalon PLLC.  And joining me is

10   transactional counsel for Ms. Shamah, Victor Didia, D-I-D-I-A.

11             THE COURT:  Thank you, counsel.

12             MR. KADOSH:  Your Honor, for the Spiewak defendants

13   it's Sam Kadosh from Reed Smith.

14             Another attorney from my firm, Joseph Tuso, is

15   either on the line or is going to be joining in.  He's not

16   admitted in New York, but he is going to be pro hac vice.

17             THE COURT:  Okay.

18             Can you give me your last name again?

19             MR. KADOSH:  Sure.  My last name is Kadosh,

20   K-A-D-O-S-H.

21             THE COURT:  Okay.

22             MR. KADOSH:  And then I also expect on the line

23   Steven Weg, who I believe is admitted in New York, and he is

24   counsel for Kwik Ticket, which is the company that's the

25   subject of this TRO.

PROCEEDINGS                    4

1          THE COURT:  Okay.  And is he on the line as yet?

2          MR. KADOSH:  He just got here.

3          THE COURT:  Is there anyone else?

4          MR. HIRSCHEL:  On behalf of defendant Malkah

5    Jacobovits, this is Daniel Hirschel, H-I-R-S-C-H-E-L.

6          THE COURT:  And you are representing who again?

7          MR. HIRSCHEL:  I apologize.  Malkah Jacobovits.

8          THE COURT:  Got it.

9          MR. WEG:  Good afternoon, Your Honor.  Joseph Tuso

10   from Reed Smith.  I just had a little trouble getting in.  All

11   circuits were busy for the first couple of attempts.  I'm

12   representing, along with my colleague, Samuel Kadosh, Mindy

13   and Larry Spiewak, although I will be having to file a motion

14   for pro hac vice.

15         THE COURT:  Okay, and you can do that after we're

16   done with the call.

17         I think everyone has now identified themselves, and

18   I'll ask that before you speak, please restate your name so

19   that the court reporter can have a clear record of who is

20   speaking.

21         I thank you all for appearing by phone today.

22         I have read the application, and I've also read the

23   declaration in opposition to the request for a Temporary

24   Restraining Order, so I'm going to start with plaintiff's

25   counsel in this case before me.

PROCEEDINGS                              5

1          It appears that there is an ongoing action in state

2     court, so why should I issue a TRO here where the similar

3     issues have been decided, at least temporarily, in the state

4     court action?

5          MR. MATALON:  Your Honor --

6          THE COURT REPORTER:  I'm sorry, who is speaking.

7          MR. MATALON:  I'm sorry, this is Joseph Lee Matalon.

8          Your Honor, the two actions are very different.  The

9     action in New York state court does not involve Florence

10    Shamah.  Although she was initially named as a defendant, the

11    plaintiff dropped her from the case after we made a motion to

12    dismiss.

13         And if you look at the complaint in that case, they

14    are seeking only very limited relief against Isaac Shamah.

15    They are seeking a declaration that Isaac Shamah cannot

16    function as an officer of the cooperation, and cannot enter

17    upon the premises of the business.

18         Even if we would concede that that's the case, what

19    we have before Your Honor is a very different case involving

20    relief that we are seeking against defendants who are not

21    parties to the action in New York in any matter, and we are

22    seeking to have restraints that undermine Florence Shamah, who

23    is also not a party in the New York state action that

24    undermine her rights as a 50 percent owner of the company.

25         So the actions have nothing to do with one another.

PROCEEDINGS                                    6

1    And even if the plaintiff was to prevail in that action, it

2    would have no effect on what we are seeking here, which is to

3    protect Florence Shamah's investment an ownership in the

4    company.

5              So although the defendants are trying to claim that

6    this is all before the New York courts and it should be aired

7    out there, in fact, there's a motion to dismiss pending in the

8    New York action, and the temporary restraints against Isaac

9    Shamah have absolutely nothing to do with was the relief that

10   we are seeking here.

11             And, in fact, if there's an objection to Isaac

12   Shamah even being the agent for Florence Shamah, which I don't

13   see how anyone would have standing to complain that he would

14   be the agent of her, as opposed to directly trying to operate

15   the company, we can easily appoint a different agent.  And

16   then they can absolutely be no objection or claim that there's

17   an overlap between what's happening in the state court and the

18   relief we are seeking here.

19             THE COURT:  Mr. Kadosh, can you clarify for the

20   Court exactly what the state court action is?

21             MR. KADOSH:  Sure.

22             Your Honor, so this is -- just to give the Court a

23   moment of background that will give some context to this

24   dispute, this is a company that's been in existence for 40

25   years.  And up until really September of this year, things

PROCEEDINGS                              7

1   operated very consistently where my client, Larry Spiewak, was

2   the one who ran the company on a day-to-day basis.

3          And he had an economic partner, who is Mr. Shamah,

4   who is now deceased.  And, you know, for 40 years they

5   operated, there was never any dispute.

6          He passed away.  The interest in the company passed

7   to his wife, who is elderly, and we have questions about her

8   capacity, and in reality the son, Isaac, who is extremely

9   litigious, has been holding himself out as her agent or that

10  he has power of attorney.

11         We've never seen any documents to suggest that he

12  actually does have that power of attorney, but he is trying to

13  insinuate himself into the running of this business which,

14  again, has operated successfully and without dispute for 40

15  years.

16         And starting in September of this year, he made

17  demands about an increased role in the company.  And initially

18  Mr. Spiewak did allow him some access, and that did not work

19  out because, you know, again, he exceed his authority, the

20  limited authority which he was given.  And he continued to

21  hold himself out as being the CEO --

22         THE COURT:  Slow down.  Slow down.  Slow down,

23  counsel, the court reporter has to keep up with you.

24         MR. KADOSH:  I'm sorry, Your Honor.

25         He was holding himself out as having authority.

PROCEEDINGS                                    8

1           Up until in January of this year, we initiated an

2    action against Florence Shamah and Isaac, her son, who, again,

3    is purporting to act as her agent or her attorney-in-fact,

4    saying that he couldn't be involved in any way with the

5    company, he could not purport himself to be acting on behalf

6    of the company.

7           And this was litigated on the merits three times in

8    state court, Your Honor.

9           Initially when we went to go seek the TRO, then the

10   Shamahs (inaudible) the second department, appealed the TRO.

11   The second department affirmed the entry of the court's TRO.

12   And then there was a third appearance before the trial court

13   where the trial court continued the TRO.

14          In each of these three appearances and orders, the

15   court -- the state court has affirmed this principle that

16   Isaac Shamah cannot be involved with the running of this

17   company, Kwik Ticket.

18          I think it's sophistry to say that these actions are

19   completely disconnected and have nothing to do with one

20   another, when the relief that they're seeking in this TRO is

21   to enjoin Mr. Spiewak from the day-to-day operations of the

22   company, which he's been doing for 40 years without the

23   consent of the Shamahs, right; whether that is, you know,

24   Florence Shamah acting through her agent, her purported agent,

25   her son, Isaac Shamah.

1          I think it's just -- it's sophistry to say that they

2   have nothing to do.  This is the exact mirror image.  The

3   state court said Isaac can't be involved.  And now they're

4   running to federal court.

5          (Inaudible.)

6          They lost three times in state court and so they are

7   now running to Your Honor and seeking an injunction mandating

8   that he be involved.

9          THE COURT:  Counsel, you will admit, however, that a

10  state court injunction saying that the son can't act on behalf

11  of the company, and can't interfere in the company's business

12  has nothing to do with the mother's interest in the business

13  and what, if anything, she can do as to the business.

14          And I think that's the distinction that the

15  plaintiff is trying to make.  That while they're related

16  issues, the injunction at the state court, if it is what you

17  said to the Court it is, that he can't act on behalf of the

18  company or represent himself as CEO, I think that's very

19  different than the mother, if, in fact, she owned a 50 percent

20  share in the company trying to assert whatever interest she

21  has.

22          MR. KADOSH:  Your Honor, if the son is purporting to

23  act on behalf of the mother as the agent, then the effect is

24  the same.  But the --

25          THE COURT:  I don't think so, counsel.

1          When you sued the son, did you sue the son in his

2     capacity as acting on behalf of his mother, or the son in his

3     own right?

4          MR. TUSO:  Your Honor, this is Joseph Tuso.  I'm

5     counsel for the company.  Steven Weg is on this call to help

6     me better answer that.  It is my understanding that it was in

7     any capacity he was reporting to act.

8          And I think it's noteworthy, we have never seen or

9     heard from Florence Shamah.  Isaac Shamah and his counsel

10    have, in all instances, purported to act for Florence but

11    solely in Isaac's name.

12         And as Mr. Matalon has repeatedly said, including in

13    court on the record in state court, for all purposes, Isaac is

14    Florence and Florence is Isaac.  So there is certainly no

15    difference in our mind.

16         Now, with said, Steven or, Mr. Weg, can you clarify

17    for the Court in what capacity Isaac Shamah was sued before

18    Judge Martin's case.

19         MR. WEG:  Yes, this is Steven Weg.

20         Mr. Shamah -- well, Isaac Shamah, there's a lot of

21    Shamahs -- Mr. Shamah was sued in any capacity of him acting.

22    Because the only way that Mr. Shamah would have any ability or

23    interest or extension of the company is through his mother,

24    and so that's why it was brought that way.

25         In other words, Mr. Shamah is not a shareholder,

1   he's not an officer, he's not a director, he's not an owner,

2   he's -- he was at some point an employee, but in his capacity

3   where he tried to instill himself as CEO and actually as CFO

4   of the company, the entire time he's acting under the color of

5   his mother's interest and under this -- under the power of

6   attorney claim that he claims to have for his mother.  So it's

7   really an extension of his mother that Mr. Shamah is acting at

8   the same time.

9          Because he's an individual, we sued him in an

10  individual capacity, because it was actually Mr. Shamah

11  himself who was going in to the company, locking Mr. Spiewak

12  out of the conference room.

13         It was Mr. Shamah himself who was calling up banks

14  and telling what -- credit card companies and telling them to

15  send statements directly to his mother rather than to the

16  company headquarters.

17         It was Mr. Shamah himself who was calling up

18  suppliers and telling them to change the method of shipping so

19  it wouldn't come by air it would come by boat it would be too

20  late.

21         It was Mr. Shamah himself who was telling employees

22  that they should pay suppliers 2 percent less than the actual

23  bill is for an absurd reason of -- that would show strength

24  and that it proves that the company has a mind of its own

25  essentially.

PROCEEDINGS                            12

1          So it was really Mr. Shamah acting, but the way he

2    obtained that or what he claimed his authority to act was, was

3    through his mother.

4          MR. MATALON:  Your Honor, may I be heard.  This is

5    Joseph Matalon.

6          THE COURT:  Go ahead, counsel.

7          MR. MATALON:  Thank you, Your Honor.

8          I don't think you got a direct answer to your

9    question.

10         The complaint alleges that Mr. Shamah is not an

11   agent of Ms. Shamah, his mother.  They claim that he therefore

12   has no authority to act.

13         And I'd like to just read the text of the TRO that's

14   in place, and it simply says that:  Isaac Shamah is enjoined

15   from purporting to act on behalf of Kwik Ticket, not his

16   mother, or representing to others that he is authorized to act

17   on behalf of Kwik Ticket, and is prohibited from entering Kwik

18   Ticket's offices.  So that's all that it says.

19         The defendants are trying to make the focus of this

20   Isaac Shamah.  In reality it's Florence Shamah.  Anyone could

21   be her agent.  And, in fact, to the extent there's a

22   suggestion she doesn't have the capacity, I have met with her.

23   She is as sharp as a tack.  She has all her faculties.  She

24   has authorized his action.  She knows everything that is going

25   on.

PROCEEDINGS                                      13

1          And if to obviate these, what we think are baseless

2     objections, we would just have Florence Shamah act directly or

3     appoint a different agent, that's fine.

4          And finally in conclusion on this point, I would

5     point out that none of the parties before you today are

6     parties in the state court action.

7          The state court action is Kwik Ticket as a

8     corporation, not the Spiewaks, not any of the other individual

9     defendants, and the sole defendant is Isaac Shamah, who is not

10    a party to this case.

11         So I think Your Honor has it exactly right that

12    there's a vast distinction between Florence Shamah seeking to

13    enforce her ownership rights, and that's independent from any

14    action that Mr. Shamah can take in his individual capacity.

15         THE COURT:  But even if you're right about that,

16    Mr. Matalon, here's the issue, though, based on the

17    discussion.

18         It appears that at the end of the day, the issue is

19    the running of the business.  And so whether it is through the

20    mother directly, the mother through her son, or some other way

21    you want to look at it, the bottom line is you're asking me to

22    issue an injunction that would affect the very business that

23    is at issue in the state court proceedings.

24         So while I do not believe that it is barred in any

25    way by *Rooker-Fedlman*, because there is no final judgment at

1    issue here, so *Rooker–Fedlman* would not apply, why wouldn't I

2    intervene under these circumstances from issuing any

3    injunction and requiring you to deal with that issue in the

4    state court, to the extent he is saying the mother has a right

5    to do this, even though the injunction is saying the son does

6    it?

7             MR. MATALON:  Okay, so first of all, the complaint

8    which is -- which frames the issues in the state court, does

9    not put in issue who has the authority to run the company.  It

10   simply says that Isaac Shamah -- there are two causes of

11   action.  It's simply a declaration that Isaac Shamah doesn't

12   have authority.

13            What's before this Court is a separate action.  It's

14   a RICO action.  It's a breach of fiduciary duty action.  There

15   are state and federal causes of action that's properly before

16   this Court.

17            And the fact that defendants brought an action

18   against Isaac Shamah and Florence Shamah, who is not a party

19   to that, seeking limited relief, that would not displace this

20   Court's jurisdiction over this action, and, you know, I

21   think -- I think it's necessary to talk about what it is we

22   are seeking here.

23            We have evidence.  We have indisputable evidence of

24   an ongoing pattern of fraud, of sealing money from the

25   company, fake invoices, checks made payable to cash.  And

PROCEEDINGS                                    15

1    we're not talking 5 or $10,000, we're talking huge sums of

2    money.

3            Defendants -- the defendant, Larry Spiewak, is

4    apparently taking the position that he has full control over

5    this company, even though he only owns half of it.

6            Under New York law and under the shareholder's

7    agreement, he can't take non -- he can't take material actions

8    without the consent of his co-owner.  She is an owner just as

9    he is an owner.

10           And at this point, regardless of what's happening in

11   the state court and the issues that are before this Court

12   today are not before the state court, we should not be

13   required -- in essence, you would be compelling to us litigate

14   issues in state court that are not before the state court.

15           What's before the state court is a very, very

16   limited action, and ultimately the issues are going to be

17   decided by Justice Block.  What we're asking -- Judge Block.

18           What we're asking for is until that motion is heard,

19   we want to make sure that critical decisions relating to the

20   company, for example, should employees be laid off during the

21   coronavirus outbreak.

22           That is not a decision, that's not a routine

23   day-to-day decision such as who we should order the paperclips

24   from, that is a decision that affects the viability of the

25   company, and that is a decision that Florence Shamah has equal

PROCEEDINGS                                    16

1    authority over.

2              So if the Court were to deny the Temporary

3    Restraining Order today, then Mr. Spiewak would feel

4    privileged to do whatever he wants with the company and to

5    make these essential critical decisions relating to the

6    viability and the future of the company without consulting

7    with his co-shareholder.

8              THE COURT:  Okay, I've heard your argument on that.

9    My followup question to you is:  What is the irreparable harm

10   here?  I don't see it.

11             You're basically saying that he's stealing money

12   from the company and running the company into the ground in

13   fact, why can't that be remedied by, if you ultimately prevail

14   in this case, money damages?

15             MR. MATALON:  Okay.  So irreparable injury is

16   founded in the fact when a shareholder is deprived of her

17   voice in management.

18             So, for example, the decision whether to lay off

19   employees or not, that has nothing to do with the theft from

20   the company, but that is a decision that she has equal say in.

21             Access to books and records.  I can't fathom -- for

22   the life of me, I can't fathom why the defendants would oppose

23   an order that says that Florence Shamah shall have access in

24   realtime to examine the bank accounts, to examine the checks,

25   not to write checks, but access to books and records and as

1   any other shareholder would have.  I mean that is something

2   that if she's deprived of that, that can't be compensated with

3   from money damages.

4          So if the Court had an opportunity to review our

5   brief, the irreparable injury is being deprived of a person's

6   one half ability to control the company and to have a say in

7   management.

8          And the fact that she wasn't involved for many

9   years, that's simply because she trusted Mr. Spiewak.  The

10  facts now show that he can't be trusted.  That he has stolen

11  money from the company.

12         And mind you, there is no affidavit from him in this

13  record, and I suspect you won't see an affidavit from him in

14  this record because he is going to take the Fifth Amendment

15  with these very serious charges that are being leveled here.

16         So whether or not we get a money judgment at the end

17  of the day for the theft, at issue here is the management of

18  the company and the control of the company.  And under New

19  York law, and under the shareholder's agreement, major

20  decisions cannot be made unilaterally by a 50 percent

21  shareholder, and that's not something that can be compensated

22  with by money damages at the end of the day.

23         MR. TUSO:  Your Honor, this is Joseph Tuso

24  (inaudible) followup questions.

25         THE COURT:  I was going to ask either you or

PROCEEDINGS                                18

1    Mr. Kadosh to reply.

2              MR. TUSO:  So if I could touch on a couple of

3    things.

4              First of all, I think -- this is Joseph Tuso.  I'm

5    very sorry.

6              First of all, I think Your Honor is -- I'm going to

7    take the last issue first, or go back one issue, you had a

8    question before.  And I think what I have a problem with is

9    that while the current complaint in the state court action by

10   Kwik Ticket involves some limited issues on the interference

11   by Ike Shamah and/or his mother in whatever capacity he is

12   purporting to act, what Mr. Matalon has failed to disclose to

13   the Court is that the judge specifically instructed that the

14   complaint be amended to dissolve that company.

15             At bottom you now have, at best, a shareholder

16   dispute, so --

17             THE COURT:  Wait a second.  Step back.  Mr. Tuso, go

18   back and explain that to me.

19             You're saying that the court -- the state court

20   judge has already issued an order to dissolve the company?

21             MR. TUSO:  No, the court gave leave to amend, and

22   for all intents and purposes, and Mr. Weg will confirm this,

23   said go amend that complaint and add a dissolution count

24   because this relationship is over, dissolve the company, it's

25   clearly at an end.

LINDA D. DANELCZYK, RPR, CSR, CCR
Official Court Reporter

PROCEEDINGS                                    19

1        So that has not -- that amendment has not been filed

2   yet, in part because the courts are basically stuck for

3   routine matters, especially the state courts, although that is

4   coming, of course, the dissolution action, because, one, we

5   agree with Judge Martin that this relationship is over; and

6   two, because he instructed the parties to do so.

7        So the fact --

8        THE COURT REPORTER:  Please slow down.

9        MR. TUSO:  I have a tendency to speak quickly, I am

10  very sorry.

11       The fact that Mr. Matalon came running into federal

12  court, and I would argue improperly for lots and lots of

13  reasons, and now arguing that the complaint does not yet have

14  that dissolution count which addresses all these things, and

15  Mr. Matalon has made of all these identical arguments about

16  alleged theft which, for the record, we 100 percent vehemently

17  object.  Mr. Matalon knows that those allegations are false.

18  He's admitted that to me on prior occasions.

19       THE COURT:  Counsel.  Counsel.  Counsel.

20       MR. TUSO:  That addresses the action in the state

21  court on what it will become and what it currently is, and

22  that's all of these same arguments have already been addressed

23  before Judge Martin.

24       On the irreparable harm, Judge, at least the way I

25  heard the way the question phrased, I agree with you a

1   hundred percent.  There is no irreparable harm here.

2              And the argument that Florence Shamah should see

3   bank statements?  Okay, those are corporate records which

4   every shareholder is entitled to in the ordinary course.  She

5   is asking this Court on an emergency basis to say, can we look

6   at a realtime, same-day bank statement.  That's frankly

7   unheard of.

8              The shareholder agreement here, which she's asking

9   you to delve into, ignoring the arbitration clause, ignoring

10  the state court action presently, it has provisions on what

11  the directors will be doing.  It's set forth in Section 3 very

12  clearly.

13             So this is much to do about nothing.  There's no

14  irreparable harm, as the Court has observed.  There's no

15  emergency here and the --

16             THE COURT:  Okay, so I'm going to stop the parties.

17  After I stop -- after I made the comment that the parties

18  should not argue to each other, I was disconnected from the

19  call.  So I've heard nothing since then.

20             Mr. Tuso, I need you to continue making the

21  arguments you were making to the Court from that point.  I

22  apologize.

23             MR. TUSO:  No problem, Judge.  I think we're all

24  dealing with the technological reality of working remotely.

25             I think then where I may have gotten cut off was,

1   and correct me if you heard this part, but I was saying that

2   the stat court action presently, because Mr. Matalon said

3   those issues aren't before the state court.  The judge

4   instructed the parties to file a dissolution action.  To amend

5   that complaint and file a dissolution count.

6          The fact because of largely what has occurred in the

7   last couple of weeks, that amendment hasn't taken place yet,

8   does not mean those issues aren't before the court.  Those

9   very same arguments, including the allegations, the knowingly

10  false and fraudulent allegations, by Mr. Spiewak were all

11  addressed before Judge Martin.

12         He considered them.  He rejected them.  He said at

13  the end of the day, the good 'ole garden variety dispute

14  between shareholders and the company, the relationship is at

15  an end, and so he formally end that.  File the dissolution

16  count.  That will be done in due course when -- you know, when

17  the state court fog is done.  So that is -- that is and will

18  be before the state court.

19         On your comments about irreparable harm, I agree

20  with the Court completely.  There is no irreparable harm here.

21         Even if everything that he alleged wildly is true,

22  which it's not, you have a good 'ole garden variety

23  Mr. Spiewak can write a check and put back money that he

24  allegedly took.  The argument --

25         THE COURT:  Slow down.  Slow down, counsel.

PROCEEDINGS                            22

1             MR. TUSO:  I realized I was speeding up.  I'm sorry.

2             The argument that it's irreparable if she doesn't

3    see a bank statement the same day, that's a novel argument.

4             A shareholder, a passive shareholder, in any

5    corporation certainly has entitlement under the shareholder

6    agreement and the New York general corporation law to company

7    records in the ordinary course.

8             I don't think that extends to the same day.  But if

9    that's the emergency basis that he is coming here for to see a

10   bank statement the same day online, that's just a complete

11   waste of the parties and this Court's time.

12            There's no irreparable harm.  There's no likelihood

13   of success on the merits.  And the status quo is for the last

14   40 years has been Larry Spiewak as the president of this

15   company and operating it on a day-to-day basis.

16            The shareholder agreement that he points to lays out

17   in Section 3 the various topics, I think there's six or seven,

18   of which the board could make joint decision -- it has to be a

19   majority, three out of four has to make a decision.

20            If there's a dispute under that agreement, that

21   agreement also requires arbitration.  Instead he came running

22   to federal court, knowing that the state court action, which

23   directly impact these issues, or instead of going to AAA,

24   which is mandated under that shareholder agreement, and

25   brought up these -- I want to be careful of my words --

PROCEEDINGS                                    23

1    ridiculous claims of RICO count, which will be dismissed in

2    very short order, and so there is at the end of the day --

3    forget the merits, there's no basis for an injunction here and

4    to enter a Temporary Restraining Order.

5              THE COURT:  I have a followup question.  You

6    mentioned the status quo, and I believe there's some

7    discussion as to the fact that there are four board members.

8              Are there currently four board members?

9              THE COURT REPORTER:  Who is speaking?

10             THE COURT:  This is still Mr. Tuso, right?

11             MR. TUSO:  Mr. Tuso, yes, T-U-S-O.

12             So there was David Shamah, the patriarch of the

13   family, who passed away about 15 years ago, and Mr. Spiewak

14   started this company, I think it was 1980, 1981, so almost 40

15   years now, and they had a very short form shareholder

16   agreement which called for each constituency to appoint two

17   directors each.  And, again, they would make decisions as

18   enumerated, if any to be made, under paragraph 3 -- Section 3

19   of that document.

20             They, by all their admissions, never followed that,

21   and instead Larry was the president, David was an active

22   friend of Larry, he tried to run --

23             (Interruption.)

24             Was that a question?

25             THE COURT:  There was no question.  There's just a

PROCEEDINGS                                    24

1   bunch of feedback.

2             MR. TUSO:  I'm sorry, Judge.  I'm sorry.  I'm sorry.

3             So the Shamahs were half equity investors, and Larry

4   was the business guy who ran the business.  And so they never

5   did.  And David came in and he and Larry were close, and they

6   remained close until his death, and that's how the company

7   ran.

8             So there were not (inaudible) board members, but I

9   think as Judge Martin was very clear on, there was still a

10  deadlock, which is -- that's why it's leading to dissolution,

11  which is happening.  It's happening next.  So there have not

12  been, although there could equally be, a deadlock position.

13            THE COURT:  Got it.

14            MR. MATALON:  Your Honor, may I be heard.

15            MR. KADOSH:  Hold on.  This is Samuel Kadosh.

16            THE COURT:  Yes, I'll hear fully from defendants,

17  and then I'll come back to you, Mr. Matalon.

18            MR. MATALON:  Thank you, Judge.

19            MR. KADOSH:  Your Honor, if you compare the --

20            THE COURT:  And this is Mr. Kadosh, right?

21            MR. KADOSH:  Yes, this is Mr. -- yes.  Yes, Your

22  Honor.

23            If you compare the relief that they're seeking in

24  the TRO, it goes far beyond the major decisions that are

25  allocated to the board of directors in the shareholder

PROCEEDINGS                                    25

1    agreement.

2              The relief that they're seeking here is, number one,

3    making any payments on behalf of Kwik Ticket without the

4    consent, in writing, as plaintiff Florence Shamah or her

5    agent, Isaac Shamah.  And then a decision that's (inaudible)

6    running the day-to-day of the business, which was never given

7    over to the board of directors.

8              Number five -- or number two, issuing any checks

9    drawn on an account of Kwik Ticket payable to cash.  Making

10   any payments in cash, except for incidental payments, less

11   than $50.  Making or implementing any decision on behalf of

12   Kwik Ticket, open paren, other than routine day-to-day

13   decisions, without the consent of Florence Shamah --

14             THE COURT:  Slow down.  Slow down, counsel.

15             MR. KADOSH:  Without the consent of Florence Shamah

16   or her agent, Isaac Shamah.

17             Now, when you compare that, they filed the

18   shareholder agreement that I want to set aside for the moment,

19   the question of whether it's been followed for the last 40

20   years.  But even if you work under the assumption that, you

21   know, the parties are still bound by it, it's document Number

22   12-2.  They filed it as an exhibit to their declaration.

23             And if (inaudible) and you look at the types of

24   decisions that require a board majority, a board of director's

25   majority, in order to make (inaudible) major supervisory or

PROCEEDINGS                                    26

1   executive personnel, not -- not hiring or firing any employee.

2   The change in salary or other compensation of any shareholder,

3   not the compensation of any employee.  Merger with another

4   entity.  That's not happening now.  Leasing the office or

5   warehouse space.  That's not happening now.

6              Those are just decisions that the Shamahs, even if

7   (inaudible) improperly appointed themselves to the board of

8   directors, those are the decisions that they entitled to, Your

9   Honor.  They are not entitled to have a veto power over every

10  payment over $50.  That's simply not what the shareholder

11  agreement allows them, Your Honor.

12             And beyond that, there is no emergency here.  This

13  dispute has been going on (inaudible) all the allegations of

14  theft of mismanagement since September of 2019.  Why are they

15  waking up on March 19th, right in the middle of a national

16  crisis, suddenly deciding that they need emergency relief.

17             What has (inaudible) after they lost the fight in

18  state court, but what exactly has motivated them today or

19  yesterday to come to the court, and not in September, and I

20  think the fact that they waited since September until March

21  really casts doubts on the veracity of their claim that

22  there's some urgent crises that requires immediate court

23  invention that will radically change the way that the

24  company's been running for 40 years.

25             THE COURT:  Okay.  Anyone else from the defendants

PROCEEDINGS                            27

1    who would like to be heard?

2              Then, Mr. Matalon.

3              MR. MATALON:  Okay, Your Honor.  We have a lot of

4    territory to cover here.  I'd like --

5              THE COURT:  Take it slow so that the court reporter

6    can keep up with you.

7              MR. MATALON:  Okay.  I would like to address the

8    last point first, which is Mr. Kadosh's comment, well what

9    happening since September?

10             What happened in September is Mr. Shamah approached

11   Mr. Spiewak with the evidence of the fraud and the theft.  And

12   he said we're going into court for a preliminary injunction

13   unless we agree that it's going to stop.

14             And at that time, Mr. Spiewak agreed to a

15   resolution.  It's a very simple resolution, which was

16   unanimously agreed to and, in essence, it's that resolution

17   which we would like to have reinstated by the Court.

18             The resolutions by its terms expired after 30 days.

19   But then the parties continued to abide by it for three more

20   months.  That resolution says:  No payments of checks, unless

21   it's agreed to by both sides.  It says:  No payments payable

22   to cash.

23             Why would a business -- I'm not even sure why the

24   defendants object to that.  Why would a business need to write

25   checks payable to cash instead of to the proper payee?  It

PROCEEDINGS                              28

1    also says:  You can't make payments in cash, meaning green

2    currency.  It also gave access to books and records.  It also

3    said that Ms. Shamah or her agent can have office space in the

4    office.

5              We are not seeking to implement the office space,

6    but we are seeking to implement all the other provisions,

7    which are very reasonable and protects the interests of a

8    50 percent shareholder, particularly when the theft has been

9    uncovered in the phony invoices, which they can deny all they

10   want, but it's documentary.

11             That narrow relief, which would be afforded any

12   50 percent shareholder is what we're seeking to have

13   implemented.  So the question is, what's going to happen in

14   the next week?  You know, what's the big emergency?

15             The big emergency, as I mentioned, is that there are

16   decisions to be made regarding the viability of the company.

17   Are employees going to be laid off?  Is the company going to

18   shut down?  Those are decisions that are -- they're not

19   routine to day to day, they're unprecedented decisions.  And a

20   decision made by Mr. Spiewak regarding the company and its

21   future cannot be dealt with after the fact.

22             Now, in terms of what was before the state court, I

23   disagree vehemently that Judge Martin ordered the parties to

24   do a dissolution proceeding.  He wondered out loud, during the

25   oral argument, of whether the relationship is viable and said

PROCEEDINGS                           29

1    there may need to be a dissolution proceeding.

2             He certainly didn't order one.  I don't think he can

3    order a party to a dissolution proceeding.  And even if there

4    were a dissolution proceeding that is a yet to come, the

5    question is protection of my client in the interim.

6             We now have an action that's validly before this

7    Court, and we're seeking injunctive relief in this action, and

8    the fact that at some point in the future the corporation or

9    Mr. Spiewak may decide to file a dissolution action has no

10   bearing on what we're doing today.

11            And by the way, the court's decision continuing the

12   TRO was back in February, before there was any coronavirus or

13   any alleged shutdown in the courts, which would have

14   prohibited the starting of a dissolution proceeding.

15            And by the way, the dissolution proceeding will not

16   deal with the same issues that we have before the Court today.

17            So regardless of the fact that over many years my

18   client wasn't involved day to day, that's because she trusted

19   Mr. Spiewak and he has breached that trust, demonstratively

20   and with documents.

21            So what's before the Court today is really what

22   should be in place until Judge Block gets to hear and decide

23   the preliminary instruction.

24            We are asking for very narrow relief.  We are asking

25   that no check be paid, unless it has my client's approval.  By

PROCEEDINGS                                    30

1    the way, that requirement was adhered to from September until

2    January, when the ex parte TRO was obtained, eliminating my

3    client from -- Mr. Shamah from the business.

4            At that point they cut him off from the online

5    access to the information.  And whether or not -- whether or

6    not the defendants think that, you know, that's something that

7    can be dealt with in the ordinary course in getting the

8    information after the fact, the reality is in terms of

9    control, and in terms of ownership, Mr. Spiewak has no

10   superior rights than my clients.

11           All we are asking is that any major decisions that

12   need to be made have to be consulted -- have to be the result

13   of a consultation with my client, and her agreement; that

14   payments have to be approved by her; and that they not write

15   checks to cash any more; and that we have online access and

16   hard copy access to books and records.

17           We're not asking for a lot.  And we're asking for

18   anything that a 50 percent shareholder would be entitled to,

19   and particularly given the allegations that we have are

20   extremely appropriate here, Your Honor.

21           THE COURT:  Okay.

22           MR. TUSO:  Your Honor, Joseph Tuso.  I understand --

23           THE COURT:  Go ahead, and make your point, Mr. Tuso.

24           MR. TUSO:  I think that, first of all, we are buried

25   in the weeds certainly and far beyond the scope of TRO motion

PROCEEDINGS                                         31

1    and arguments and really just I think beyond the reason we are

2    here.

3              However, some major misstatements were made, and I'm

4    very surprised that Mr. Matalon continues to talk about this

5    resolution when he knows full well that it is the result of a

6    fraud by his client that he was involved in.

7              He provided a draft of a resolution that asked for

8    all the things that he just listed, and we unquestionably

9    said, "No", in writing and I revised it.  He came back --

10             THE COURT:  Slow down.  Slow down.

11             MR. TUSO:  I'm sorry, Your Honor.

12             He said I'd like this one thing included.  I said

13   "No," the resolution only deals with the (inaudible).  He then

14   said "Okay".

15             My client, listen, he's known this family for 40 or

16   50 years.  You consult him for being naive.  Mr. Shamah, Isaac

17   Shamah, said, "Here, sign this.  This is Joe Tuso and Joe

18   Matalon have worked it out, it's done."

19             Larry foolishly signed.  And we found out it was the

20   one that I specifically and in writing said no to and

21   Mr. Matalon acknowledged that I said no to.

22             When this was raised before Judge Martin, the

23   response is not that they didn't do that, the response was,

24   for all intense and purposes, Larry was a dupe, he should have

25   called you.

1            And that's not okay to perpetrate a fraud involving,

2    you know, my -- a lawyer on this side, he's a represented

3    party, and Isaac had counsel that worked on the draft of this

4    resolution.

5            But Mr. Matalon is correct, even if it was executed

6    as a result of a fraud, it expired in 30 days.  So that's

7    gone.

8            We are opposing the TRO, not specific questions of

9    it, but the totality of it, because it is an extraordinary

10   request under these circumstances.  He's asking for you to

11   revise this share -- this 40-year-old shareholder agreement,

12   just to do things that it was, one, never intended to do, but

13   to claim that, in this pandemic that we have, that Larry may

14   decide as the president to hire or fire somebody, the same

15   thing that he's done solely for 40 years.

16           Hiring a warehouse worker.  Hiring a secretary or

17   laying one off, for that matter, has never been a board

18   decision, it's always been a president's decision.  So he's

19   asking you to change what he's done for 40 years.  It's

20   frankly unprecedented.

21           And I would note that, you know, we are concerned

22   that after the injunction, the TRO in the state was granted, a

23   few hours later, his client -- which he said his client and

24   then he said Mr. Shamah -- that Mr. Shamah went and violated

25   the TRO and moved about $17,000 from the company's account,

PROCEEDINGS                                    33

1    after he had improperly gained access to it, to pay for his

2    daughter's school tuition.  We called him out on that, of

3    course.

4              All this is saying, Judge, at the end of the day,

5    this is, again, at bottom, just a good 'ole fashion deadlock

6    between shareholders in a closely-held corporation.  There is

7    no emergency.  It is inappropriate, of course, for federal

8    court's intervention, particularly one where he's asking you

9    to enter an order that would do away with three separate

10   orders now in the state court where an action is pending.

11             I will be done now, because I don't want to keep

12   going on and on.  I do think that Mr. Weg, on behalf of the

13   company, who was involved in the state court and wants to

14   comment as well.

15             THE COURT:  Mr. Weg?

16             MR. WEG:  Thank you, Your Honor.  Steven Weg.

17             The one thing I wanted to comment on, because I

18   think it was a misstatement by Mr. Matalon who said this

19   entire issue wasn't raise in the state court.

20             Having actually argued before Judge Martin,

21   Mr. Matalon was holding a draft in the complaint for this case

22   and waiving it before Judge Martin in the state court and was

23   talking about all the allegations of theft that are being

24   raised here and the allegations of mismanagement, and I think

25   the point of that was to try to get Judge Martin to permit the

PROCEEDINGS                         34

1   relief that is being requested here.

2           So to say that this wasn't actually raised in the

3   state court is absolutely not true, because it was the basis

4   for Mr. Matalon's opposition.

5           So there's definitely a ruling, there's definitely

6   something that was already considered by the state court,

7   rejected, it's just completely inappropriate from the

8   corporate governance level to suddenly change 40 years of

9   history.  It's completely from left field.  It is really --

10          THE COURT:  Okay.  So I am going to now rule on the

11  application for a TRO.

12          First, I'm going to state for the record what the

13  standard is and what the relief is that is being sought.

14          As all parties know, a preliminary injunction is an

15  extraordinary remedy, and it's never awarded as of right.  The

16  purpose is to preserve the relative positions of the parties

17  until a trial on the merits can be held.  And while I'm

18  reading the standard for a preliminary injunction, as you are

19  all aware, it is the same standard for a TRO.

20          A party seeking such relief must establish

21  irreparable harm, likelihood of success on the merits, or

22  sufficiently serious questions going to the merits of his

23  claim, to make them be a grounds for litigation, plus the

24  balance of the hardship is indirectly in the favor of the

25  moving party, and that the preliminary injunction is in the

PROCEEDINGS                                      35

1    public's best interest.

2              However, a heightened standard is appropriate where

3    an injunction is mandatory, or the injunction will provide the

4    movant with substantially all the relief sought, and that

5    relief cannot be undone even if the defendant prevails at a

6    trial on the merits.

7              Here I find that plaintiff is asking for a mandatory

8    injunction; in effect, plaintiff is not asking me to maintain

9    the status quo but rather to change it.  And by asking me to

10   alter the status quo, in effect, asking me to impose as a

11   condition that were previously imposed by the resolution,

12   plaintiff needs to meet the heightened standard.

13             Based on the record before me, I find that plaintiff

14   has not, and so I am denying the application for a TRO.

15             First, plaintiff has not shown that plaintiff would

16   be irreparable injured if, in fact, the TRO is not issued.

17             As I indicated earlier, to the extent that plaintiff

18   is challenging and arguing that defendants are, in effect,

19   stealing money from the company and is worried about the

20   manner in which the company is being run, that can all be

21   remedied at the end of this lawsuit by monetary damages.  And

22   as we are all aware, irreparable harm is the single most

23   important prerequisite for the issuance of injunctive relief.

24             And because plaintiff cannot show irreparable harm,

25   plaintiff is not entitled to a TRO, and I am denying it.

PROCEEDINGS                                        36

1              Judge Block has set this matter down for a

2      preliminary injunction hearing for March 31st at 2:30 p.m.

3              Is there anything else we need to discuss today?

4              MR. MATALON:  Not from us, Your Honor.

5              MR. TUSO:  Is that going to an electronic as well, I

6      presume, given the state of the world?

7              THE COURT:  I assume so, but Judge Block will likely

8      issue an order as to how he plans to proceed.  The court I

9      believe will be closed at 3.  We're all working remotely.  I'm

10     simply here as the emergency judge this week.

11             So I suspect that it will be electronically, but he

12     will follow up.  I did confirm with him that he will hold a

13     preliminary injunction hearing on that date and at that time.

14             MR. KADOSH:  Thank you, Your Honor.  I just

15     messengered you (inaudible) --

16             THE COURT:  No, no, no.  I did not take it as such,

17     counsel.

18             Yes, I believe, Mr. Matalon, were you trying to

19     saying something to the Court?

20             MR. MATALON:  Yes.  Is there a briefing schedule

21     that's going to be put in place?

22             THE COURT:  I'm not sure.  I will notify Judge Block

23     as to today's ruling and let him know that the parties would

24     like further information.

25             To the extent the parties can agree on a briefing

PROCEEDINGS                          37

1    schedule, you should do so and simply notify the Court.

2              I'm happy to work it out with you now.  Is there a

3    schedule that the parties can agree to, or are you willing to

4    rely on the papers that you submitted to the Court today?

5              MR. TUSO:  I think for -- I think for Larry and

6    Mindy --

7              THE COURT:  And this is Mr. Tuso or Mr. Kadosh?

8              MR. TUSO:  No, it's Tuso.  I'm sorry, Your Honor,

9    I'm not used to the electronic stuff.  My apologies.  Joe Tuso

10   for Larry and Mindy Spiewak.

11             I think that we put forth the sum and substance of

12   what we wanted to be able to address on today's call.  I do

13   think, though, that we would probably like to submit a more

14   formal response, you know, with the standards and lay them out

15   and how the facts apply to law.

16             And so, Sam, are you in agreement, since you're lead

17   on this?

18             MR. KADOSH:  Yes, we're definitely going to submit

19   something.

20             THE COURT:  To the extent, especially since I only

21   gave the defendants a few hours to submit something yesterday.

22             How much time do you need to do so?

23             MR. KADOSH:  If we have a hearing on the 31st?

24             THE COURT:  Yes.

25             MR. KADOSH:  Two weeks for something in by next

PROCEEDINGS                                    38

1    Friday?

2              THE COURT:  Hold on, let me just look at the

3    calendar.

4              Next Friday would be the 27th.  That wouldn't give

5    Mr. Matalon a lot time to respond.

6              Mr. Matalon, how about if they were to serve you

7    papers on Thursday, the 25th, and that way you can have until

8    the 30th, but as early as possible on the 30th you put in a

9    reply.

10             MR. MATALON:  Could we get a day earlier for them,

11   Wednesday?

12             MR. KADOSH:  You know, we're operating under

13   challenging conditions trying to coordinate everything

14   remotely, and in my practice, at least, not many judges give

15   reply briefs for a PI hearing, it's usually done on two

16   briefs.

17             THE COURT:  That is --

18             MR. KADOSH:  You know, we -- I'm going to need I

19   think until Thursday just to gather up everything, you know,

20   work with everybody remotely.  So I'd prefer to keep it at

21   Thursday.  If they're allowed and they want to put in a reply,

22   a short reply, you know, could be done by Monday.

23             THE COURT:  I think that's fair.  And so I'll give

24   you until the 26th.

25             And then, Mr. Matalon, if you want to reply to it,

PROCEEDINGS                                          39

1    do so by the 30th --

2              THE COURT REPORTER:  I'm sorry, Judge, you got

3    cutoff.

4              THE COURT:  And so the defendants have until the

5    25th to file a response.

6              And Mr. Matalon can respond by the 30th, Monday the

7    30th, if he chooses to do so.

8              MR. MATALON:  Okay.  And I just have one question.

9    There was reference to the hearing before Judge --

10             THE COURT:  I'm sorry, Mr. Matalon, we lost you.

11   Hello?

12             MR. KADOSH:  Yes, Judge, I think we lost him.

13             THE COURT:  Let's wait a few minutes to see if he

14   dials back in.

15             (Pause.)

16             THE COURT:  Mr. Matalon?

17             MR. MATALON:  Yes.

18             THE COURT:  Are you back with us?  Okay.

19             So you were asking about the hearing itself?

20             MR. MATALON:  Yes, yes, I was asking -- I was making

21   an inquiry as to whether any of the parties obtained a copy of

22   the transcript before of the argument before Judge Martin.

23             THE COURT:  Oh.  You can discuss that offline with

24   the parties.  Are we done with this hearing?

25             MR. MATALON:  Your Honor, the reason why is if they

PROCEEDINGS                                          40

1    have obtained it, I would like you to order them to provide

2    it.

3              THE COURT:  I'm not going to do that, counsel.  You

4    need to discuss that with the parties.  And if there is a

5    copy, you can work it out or you can get your own copy.  But

6    it's not my place to order defendants to provide you with a

7    copy of the transcript in the state court proceedings.

8              MR. MATALON:  Okay.  Thank you.

9              THE COURT:  Have a good day everyone.

10             We're adjourned.

11             MR. MATALON:  Thank you, Your Honor.

12             MR. KADOSH:  Thank you, Your Honor.

13

14             (Whereupon, the matter was concluded.)

15

16                       *      *      *      *      *

17

18

19   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

20

21      s/ Linda D. Danelczyk                    March 25, 2020

22        LINDA D. DANELCZYK                         DATE

23

24

25