**M A T A L O N PLLC**
**450 Seventh Avenue – 33rd Floor**
**New York, New York 10123**
**(212) 244-9000**
*Attorneys For Plaintiff*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
                            :

**KWIK TICKET INC., by its 50% owner,**   :  **Docket No. 1:20-cv-1201(FB) (SJB)**
**FLORENCE SHAMAH, and FLORENCE**   :
**SHAMAH, Individually,**   :
                            :
           **Plaintiff,**   :
                            :
  **--against--**   :   <u>**AMENDED COMPLAINT**</u>
                            :   **(With Jury Demand)**
**LARRY SPIEWAK, MINDY SPIEWAK,**   :
**MALKAH JACOBOVITS and JOEL BOIKESS,**   :
                            :
          **Defendants.**   :
-----------------------------------------------------------X

       Plaintiff, through her attorneys M A T A L O N PLLC, complaining of defendants,

alleges:

<u>**INTRODUCTION**</u>

     1.     This is a derivative and direct action brought by Florence Shamah, a 50%

shareholder of Kwik Ticket, Inc. (the "Company"), on behalf of the Company and herself. Ms.

Shamah, an 88-year old widow, uncovered a long-term, breathtaking pattern of fraud and theft

from the Company by its President (Larry Spiewak), his wife (Mindy Spiewak), its office

manager (Malkah Jacobovits) (collectively, the "Inside Defendants"), and outside accountant

(Joel Boikess). The Inside Defendants conspired to commit mail fraud, wire fraud, money

laundering and commercial bribery through a variety of related schemes, and Boikess knowingly

prepared fraudulent financial statements to cover up the criminality. The criminal schemes,

spanning approximately 20 years, featured the creation of hundreds of phony vendor invoices, which were supposedly received by the Company from genuine vendors and paid in the ordinary course of business. In reality, the "vendors" either did not exist, were affiliated with the Spiewaks, or had never sent the invoices. In all cases, the goods and services reflected on the invoices were never provided to Kwik Ticket. Yet the Inside Defendants caused the fraudulent invoices to be "paid" with Company funds, laundered the payments into cash in violation of the federal money laundering statute, and divvied up the proceeds among themselves. The criminal schemes cost the plaintiff corporation enormous sums of money.

2.      The Racketeer Influenced and Corrupt Organization ("RICO") statute renders unlawful the precise activities engaged in by defendants. 18 U.S.C. § 1962(c) makes it illegal for any person employed or associated with a commercial enterprise to conduct or participate in the conduct of the enterprise's affairs through a pattern of certain predicate offenses, including mail and wire fraud, money laundering and commercial bribery. Similarly, the conspiracy subsection, 18 U.S.C. § 1962(c), renders unlawful an agreement of two or more persons to conduct the affairs of a commercial enterprise in a manner which violates subsection 1962(c). As a result of defendants' RICO violations, the Company has been harmed in its business and property, and is therefore entitled to recover from defendants, jointly and severally, triple the amount stolen, and attorneys' fees.

3.      The Company was, and continues to be, harmed by other misconduct of Larry Spiewak. A former employee made credible allegations that Speiwak's behavior created a hostile work environment, including unwanted touching of her breasts. These allegations were supported by recordings of Spiewak making racially and sexually degrading comments (Exhibits N and O hereto, which can be accessed here [tinyurl.com/exhsno]). Upon information and

belief, the Company paid the former employee substantial sums, believed to be in the hundreds of thousands of dollars.  In addition, Spiewak has caused the Company to improperly pay his legal fees in the defense of this action, thereby illegally diverting several hundred thousands of dollars of Company assets.  Similarly, Spiewak and his wife have charged close to one million dollars (or more) in personal expenses to credit cards paid by the Company, and unlawfully reflected on the books and records of the Company as business expenses.  These include jewelry, vacations, cruises, doctor visits, groceries, school tuition, meals, life insurance, and much more.  All of the foregoing was carefully hidden from plaintiff by defendants.

4.      Spiewak's misconduct has also harmed plaintiff directly.  More than one year ago, Spiewak – without corporate authority – simply cut off all payments to plaintiff and her designees (while continuing to pay himself excessive compensation).  Spiewak also cut off plaintiff's health insurance without complying with COBRA notice requirements, thereby preventing the election of continuation coverage, and also cut off automobile lease and insurance payments without notice or corporate authority.

5.      Accordingly, aside from RICO remedies, defendants are liable to the corporation for breach of fiduciary duty, common law fraud, breach of contract, conversion, unjust enrichment, violations of the New York Business Corporation Law, and other state law claims.

### JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over the RICO counts pursuant to 18 U.S.C. § 1964, and subject matter jurisdiction over the state-law counts pursuant to the supplemental jurisdiction furnished by 28 U.S.C. § 1367(a).

7.      Independent of its RICO jurisdiction, this Court has subject matter jurisdiction of this action pursuant to the diversity statute, 28 U.S.C. § 1332(a)(2), in that the action is between

citizens of different states, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

8.    Venue is proper in the Eastern District of New York pursuant to 18 U.SC. §1965 and 28 U.S.C. § 1391 because, upon information and belief, all of the defendants are subject to personal jurisdiction in this judicial district and reside in this district.  In addition, all or a substantial portion of the occurrences complained of herein occurred in this district.

**PARTIES**

9.   Kwik Ticket Inc. ("Kwik Ticket") is a corporation formed and existing under the laws of the State of New York.  It was formed in 1979 under the name Swift Ticket Inc., and renamed Kwik Ticket Inc. in 1982.  Its principal place of business is in Brooklyn, New York.  For purposes of diversity jurisdiction, it is properly aligned as a defendant, since the management of the Company resists and opposes this action.

10. The corporation was founded by David Shamah and defendant Larry Spiewak.   When founded, Spiewak owned 50%, and David Shamah (and certain family members) owned the remaining 50%.  David Shamah passed away in 2001.  Today (and for the past several years), Larry Spiewak owns 50%, and David Shamah's wife, plaintiff Florence Shamah, owns 50%. Florence resides in Brooklyn, New York, and Long Branch, New Jersey.  For purposes of diversity jurisdiction, she is a citizen and domiciliary of New Jersey.

11. Upon information and belief, defendant Larry Spiewak resides in Brooklyn, New York with his wife, defendant Mindy Spiewak.

12. Upon information and belief, defendant Malkah Jacobovits resides in Queens, New York.

13. Upon information and belief, defendant Joel Boikess resides in Baldwin, New York.

14. For purposes of diversity jurisdiction, each named defendant is a citizen and domiciliary of New York.

## **DEMAND FUTILITY**

15. Florence Shamah has not made a demand upon the Company to commence this action because any such demand would be entirely futile. Since Larry Spiewak owns 50% of the Company, in order to constitute effective corporate action, Mr. Spiewak would have to vote or agree to bring an action against himself. The law does not require a party to undertake futile acts, and in this circumstance, demand is futile and excused.

16. Similarly, it would be futile to demand that Spiewak authorize a lawsuit against his wife Mindy, his loyal co-conspirator Malkah Jacobovits (both of whom are represented by the same law firm as Spiewak), or the accountant selected by Mr. Spiewak, Joel Boikess. All of these defendants acted together over several years for the common purpose of facilitating the theft of corporate assets and covering it up, principally to benefit Larry Spiewak and his wife. It is ludicrous to think that Mr. Spiewak would authorize a lawsuit against these individuals, when Mr. Spiewak precipitated their misconduct.

17. This is not a collusive action to create federal jurisdiction which the Court would not otherwise have.

## **FACTS**

18. Kwik Ticket is an enterprise which purchases tags, plastic barbs, labels and related materials in bulk from manufacturers and distributors, and resells the goods to end users, primarily retail stores.

19. Kwik Ticket has always been a relatively small business. Larry Spiewak, who has designated himself as President, is on-site and runs the day-to-day business. For many years,

and until her recent discharge, Malkah Jacobovits was the office manager who maintained the books, made bank deposits and cashed Kwik Ticket checks drawn to the order of "Cash" or to "Petty Cash."   She was also responsible for the creation of fraudulent invoices.

20.     Mindy Spiewak, wife of Larry Spiewak, does not provide any substantial services to Kwik Ticket, although she draws a substantial salary.  Upon information and belief, much of the misconduct engaged in by Mr. Spiewak came at the behest, instruction and demand of Mindy Spiewak, who personally benefitted greatly from the fraudulent activities described herein, including Company-paid vacations and expensive jewelry.

21.     According to financial statements prepared by Kwik Ticket's accountant, defendant Joel Boikess, in recent years the Company's gross revenue is around $7 million, but very little profit is shown because nearly all of the excess cash is siphoned out of the company by Spiewak and his co-conspirators, which transactions are recorded as "expenses" through fraudulent accounting.  Boikess was well aware of the fraudulent nature of the transactions, but elected to treat them as legitimate in preparing the financial statements.

**The Shamahs' Discovery Of The Fraud**

22.     Florence Shamah is presently 89 years old and has never been personally involved in the Company's business.  She entrusted her husband's former partner, Larry Spiewak, to deal with the Company's business honestly and fairly.

23.     Unbeknownst to Ms. Shamah, the IRS commenced an audit of the Company in or around 2018.  Mr. Spiewak eventually disclosed the existence of the audit to Florence Shamah because he wished to make a settlement with the IRS, which required Florence Shamah's consent, since her personal income taxes would be affected.

24.     Pursuant to a duly-executed Power Of Attorney, dated September 6, 2018 and mailed to Larry Spiewak by certified mail on September 13, 2018, Florence Shamah appointed her son, Isaac "Ike" Shamah, as her attorney-in-fact to deal with Kwik Ticket and other financial affairs.

25.     In turn, Mr. Shamah requested access to various books and records of the company, both directly and through counsel.  Although Mr. Spiewak stonewalled, delayed, and obfuscated, the records Mr. Shamah eventually obtained, coupled with his independent investigation, uncovered a massive fraud and theft of Company funds stretching over as much as 20 years.   Mr. Shamah learned that phony expenses and purchases of merchandise for resale were recorded in the books of the company when, in reality, these were not expenses or purchases at all, but attempted cover-ups of Mr. Spiewak's and Ms. Jacobovits's theft of Company funds.

26.     Ms. Jacobovits, at Mr. Spiewak's direction, provided Ike Shamah with a check register purporting to show the payee of every check written by the Company for the past few years.   On its face, the check register appeared legitimate.  However, with respect to certain vendors, examination of the actual, underlying cancelled checks showed that the checks were not actually made payable to those vendors, but to "Cash."  Mr. Shamah further learned that these checks were most often brought to the bank by Ms. Jacobovits, who withdrew the money in cash (currency), which was then divvied up among the Inside Defendants.

**PMX Freight Systems**

27.    Upon information and belief, many years ago Kwik Ticket did business with a company named PMX Freight Systems, but has not done any business with that entity in recent years. Yet the check register indicated several recent payments to PMX.  See, e.g. Exhibit A hereto (2017 register).  However, upon further investigation, it turned out that the actual checks were not made payable to PMX Freight Systems – as one would expect, were the checks legitimate -- but instead to "Cash."  These checks were typically endorsed by Ms. Jacobovits and the money was withdrawn from Kwik Ticket's bank account in currency.  Annexed hereto as Exhibit B, for illustrative purposes, are a series of such checks (there are many more).  Each of these contains Ms. Jacobovits's endorsement and were cashed (not deposited into a bank account).  Spiewak caused the "PMX" checks to be encoded with the address 183 27th St., Brooklyn, New York.

28.    Spiewak and Jacobovits also caused the creation of phony invoices allegedly issued by PMX.  See Exhibit C hereto.  Although PMX is a trucker, most of the invoices indicate that PMX was selling "labels" or "tags" to Kwik Ticket – which is simply not true and makes no sense, since PMX, a trucker, does not sell either labels or tags.

29.    In short, although on the face of the Company's records, Kwik Ticket incurred business expenses through a business relationship with PMX, the reality is that the parties did no business for well over a decade.  Instead, the money was simply stolen by the Spiewaks and the Company's office manager.

**Basic Office Essentials**

30.    Upon information and belief, Spiewak formed a New York corporation named Office Essentials, Inc. in 2001, and is the owner of that entity.

31.     Ms. Jacobovits, acting at Mr. Spiewak's direction, created fictitious invoices allegedly issued by Basic Office Essentials (a variant on the corporate name Office Essentials, Inc.) (Exhibit D hereto).  As can be seen, these invoices have the same template as the PMX invoices.  The "vendor's" address indicated on the invoices is 820 E. 42nd Street, Brooklyn, New York 11210, one block away from Kwik Ticket's offices. Kwik Ticket, however, did not purchase "register paper" from "Basic Office Essentials" (or anything else) as indicated on the invoices.

32.     There are dozens of checks payable to "Cash" encoded with the address 181 27th St., Brooklyn, New York – apparently "PMX's" neighbor.  Exhibit E hereto.  These are recorded in Kwik Ticket's books and records as payments to the vendor "Basic Office Essentials," supposedly for payment of invoices.   The vast majority of these checks bear the endorsement of Ms. Jacobovits, and the money was withdrawn from Kwik Ticket's bank account and stolen by Mr. Spiewak and Ms. Jacobovits.

33.     There are also checks payable to "Basic Office Essentials" with the address of 181 27th St. (a different address than the one on the alleged invoices).  That address was a code to enable the defendants to associate the checks with the fraudulent Basic Office Essentials invoices.  E.g., Exhibit F hereto. These checks too were endorsed by Ms. Jacobovits and cashed or deposited into either her or Mr. Spiewak's personal checking accounts. This is additional evidence that Basic Office Essentials is not a legitimate, outside vendor, but is affiliated with Mr. Spiewak. Otherwise, Ms. Jacobovits could not have properly endorsed those checks.

**Mega Plastic Group**

34.     Mega Plastic Group is an actual Kwik Ticket vendor.  Several of the checks for Mega Plastic Group (as reflected in the company's books) were made payable not to Mega

Plastic, but to "Cash," and were endorsed and cashed by Ms. Jacobovits. See Exhibits G (checks) and H (check register) hereto. These checks are encoded with the address 2667 Coney Island Avenue in Brooklyn. There were also checks made payable to Mega Plastic Group which Ms. Jacobovits endorsed and cashed at the bank.

**Morris Trucking**

35.    Mr. Spiewak has signed dozens of checks each year payable to "Cash" which are reflected in the company's books as payments to Morris Trucking. Morris Trucking, however, did not provide the services reflected on the invoices. The checks are almost always in excess of $1,000. The checks are endorsed and cashed by Ms. Jacobovits. Annexed hereto as Exhibit I are copies of some of the checks referenced above, as well as fictitious Morris Trucking invoices created by Ms. Jacobovits.

**Blanca Cleaners**

36.    Ms. Jacobowits created fictitious invoices allegedly issued by Blanca Cleaners every two weeks for carpet cleaning. Each invoice is for exactly $500. But each invoice is allegedly paid by two separate checks payable to "Cash," the checks vastly exceed the invoice amount, and each such check is endorsed and cashed by Ms Jacobovits. For example, the June 20, 2013 $500 invoice, is paid by two checks payable to "Cash," one for $3,500 and one for $4,000, and Ms. Jacobovits endorsed and cashed each one. (Exhibit J hereto). Also included in Exhibit J are additional documents reflecting this scheme.

**Petty Cash Theft**

37.    On a weekly basis, Kwik Ticket issued checks to "Cash" or "Petty Cash" which were reflected on the company's books as "Petty Cash." These amounts are hardly petty – most are for several hundred, although there are many over $1,000, and least two for $5,000. (Exhibit

K hereto.) There has been no explanation of why the business needs these large amounts of cash. These checks are mainly endorsed and cashed by Ms. Jacobovits, although some were deposited in her personal account or that of Mr. Spiewak. Although reflected on the Company's books as "expenses," in reality these checks are the product of the Inside Defendants' theft of Company funds.

**Credit Card Abuse**

38.     Spiewak's greed and deceit were boundless. He had the company pay for *virtually every personal household expense* – groceries, meals, jewelry, clothing, vacations, doctors, nail salons, more jewelry, school tuition, furniture, simply everything. Worse, the Spiewak's adult children were also permitted to charge food, clothing, vacations and other items to the Company. And all of this was made to appear to be genuine business expenses, and thereby hidden from plaintiff. How was this accomplished? The Spiewaks maintained numerous credit cards. Some of were in the name of the company, some in Spiewak's personal name, and some in other names, such as the office manager. Practically a*ll* personal Spiewak expenses, the ones mentioned above and others, were charged to the various business and personal cards, *and paid for in full each month by the Company*. The personal expenses were then allocated on the books and records of the company as "Office Expenses," "Purchases," "Auto," "Meals and Entertainment" and the like. The amount of this theft greatly exceeded one hundred thousand dollars each year, and over the past 20 years or so, is in the millions.

**Other Abuses**

39.     Mr. Spiewak has abused the company in other ways, without the prior knowledge or consent of plaintiff.

      A.   Compensation.   The owners of Kwik Ticket obtained distributions in the form of salary payable to themselves and designated family members. Yet although Mr.

Spiewak and Ms. Shamah are equal owners, the distributions to each side were grossly *unequal* – the Spiewak payment was about double the Shamahs'. Mr. Spiewak has also taken year-end bonuses in the tens or hundreds of thousands of dollars without the consent or knowledge of Ms. Shamah. He has also used corporate funds to pay his own personal income taxes, and has taken loans from the company without the knowledge or consent of Ms. Shamah. All of the foregoing is to the detriment of the Company.

B. <u>Donations</u>. Mr. Spiewak appears to be a very charitable person, particularly when half of the money is not his. Without the consent of his co-shareholder, Spiewak has make large charitable donations – using company funds and to the detriment of the Company.

C. <u>Pension Fund</u>. The Spiewaks created a pension/401K plan, and have been contributing corporate funds to their plans, including "matching" funds for years. Under the plans, Mr. Spiewak was provided the right to make "discretionary contributions" to his and his wife's account.

D. <u>Insurance Policies</u>. Mr. Spiewak used tens of thousands of dollars of the company's funds to purchase life insurance policies for himself and Mrs. Spiewak, and named himself and his wife as beneficiaries on these policies.

**<u>Defendants' Temporary Cessation And Later Resumption Of Fraudulent Conduct</u>**

40.      After the discovery of the fraudulent conduct described above, Florence Shamah retained counsel who threatened litigation by letter dated August 30, 2019 (Exhibit L hereto). In conversations between Ike Shamah and Larry Spiewak, Ike Shamah told Mr. Spiewak that unless immediate measures were taken curb the fraud, he intended to seek a preliminary

injunction. To avoid that, Mr. Spiewak agreed to a corporate resolution which provided, among other things, that "all payments made by the Company shall require the written consent of all of the shareholders of the Company;" that the Company shall not make payments in cash (except for incidental expenses of not more than $50); shall not issue checks payable to "Cash;" that each shareholder shall have full and complete access to all books and records; and that any shareholder or an agent thereof may use and occupy office space at the Company's offices. The resolution was dated September 12, 2019, and was to expire after a 30-day try-out period, on October 12, 2019 (Exhibit M hereto).

41.     Upon adoption of the resolution, Ike Shamah began working full time at the Company, putting systems in place to professionalize the organization and prevent the fraud and financial abuse visited upon the Company by defendants. Coincidentally, no invoices were received from the "vendors" PMX, Basic Office Essentials, Mega Plastics, or Morris Trucking, and no business was transacted between those vendors and the Company. This leaves no doubt that the earlier transactions with those "vendors" were entirely fraudulent, to the severe detriment of the Company.

42.     As part of his investigation, Mr. Shamah learned that not all of the cash derived from the fraudulent transactions was retained by the Inside Defendants. Mr. Spiewak directed that some of the money be paid to employees of the Company as compensation. Florence Shamah was not aware of these payments prior to 2019, and has insisted that all cash payments -- to any recipient – cease. Notwithstanding that some of the cash may have been used to compensate others, the vast majority of the funds derived from the phony and fraudulent transactions ended up in the Spiewaks' pockets.

43.     Mr. Spiewak's expressed fears that requiring joint consent would cripple the Company proved to be unfounded – as Florence Shamah, through her agent, did not object to any legitimate business payments -- and after the resolution expired, the parties continued to abide by it.  To implement the resolution's requirement that each shareholder have full access to information, Ike Shamah was given on-line access to the bank account, the numerous credit card accounts, and other information.

44.     As time went on, Spiewak and his wife resented that they could no longer steal from the Company as a result of Ike Shamah's oversight and implementation of controls.  Their solution was to obtain an ex-parte temporary restraining order from Supreme Court, Kings County (supported by a false allegation that Mr. Shamah had never been appointed Florence Shamah's agent), and a preliminary injunction, enjoining Mr. Shamah from "purporting to act on behalf of Kwik Ticket or representing to others that he is authorized to act on behalf of Kwik Ticket" and prohibiting him from entering Kwik Ticket's office.

45.     Immediately thereafter, Spiewak blocked Florence Shamah's access to information by removing her agent from all applicable accounts.  In addition, the consent of Florence Shamah or her agent to payments was no longer sought by Spiewak.  Upon information and belief, the defendants have resumed their unlawful looting of the Company.

**Larry Spiewak Further Retaliates Against Florence Shamah**

46.     This action was commenced on or about March 4, 2020.  In retaliation, Spiewak unilaterally cut off all compensation and perquisites to Mrs. Shamah and her designee.  Thus, for the first time in 40 years, no Shamah received compensation or distributions in respect of their 50% ownership of the Company.  Naturally, Spiewak continued his own compensation and perquisites during the litigation.

47.     In addition, the co-owners, Larry Spiewak and Florence Shamah, made an agreement many years ago that the Company would pay for the lease and insurance on at least one automobile for each (with Spiewak's consent, at the commencement of this litigation, the "Shamah" vehicle was used by Florence's son Isaac.)   Yet after litigation commenced, and without notice to plaintiff or Isaac, Larry Spiewak caused the company to stop making the lease payments for the Shamah vehicle, and removed the car from the Company's insurance policy. The latter action caused Isaac Shamah's driver's license to be suspended by New York State for an extended period, because it is illegal for a person to have a vehicle registered in his or her name without carrying insurance on that vehicle.

48.     Moreover, and also in accordance with the owners' agreement, plaintiff and/or her children participated in the Company's health insurance plan, at Company expense.  But after the filing of this action, Spiewak removed all Shamahs from the Company health insurance plan without telling them.  Isaac Shamah only found out, with embarrassment, at a doctor's appointment.  In fact, because Spiewak did not tell the Shamahs that they were being removed from the insurance, and withheld the required COBRA notice, Isaac Shamah could not even elect continuation coverage under COBRA, because the period to do so had expired even before Isaac learned of his and his family's removal from the plan.

**Spiewak's Creation Of A Sexually And Racially Hostile**
**Work Environment Caused the Company To Suffer Serious Harm**

49.     As the President, any sexual or racial harassment in the workplace caused by Spiewak is imputed to the Company.  After the commencement of this action, a former employee complained of having been subjected to harassment, including unwanted touching of her breasts by Spiewak.  The allegations of a hostile environment were supported by tapes of Spiewak interacting with employees, made without his knowledge.

15

50.     In one such conversation (Exhibit N hereto, tinyurl.com/exhsno), Spiewak adopted the persona of an African-American man bragging about his "Black Card," a euphemism for genitalia:

> [SPIEWAK]: (Inaudible) I got a black card.
>
> [WOMAN]: (Laughter)
>
> [SPIEWAK]: I got all kinds of shit.  People see my black card, they start moaning. Those bitches moan, "ah, ah, ah."
>
> [SPIEWAK]: Shiiit
>
> [WOMAN]: Shiiit
>
> [SPIEWAK]: Yeah, bitch I got a black card.  "Ah ah. Do it again, don't stop now, it's been only an hour.  Ah, ah"
>
> [WOMAN]: An hour? Alright.
>
> [SPIEWAK]: Damn
>
> [SPIEWAK]: (Inaudible) "Ah, ah."

51.     In another such episode (Exhibit O hereto, tinyurl.com/exhsno), Spiewak told a crude sexual joke about a Kwik Ticket employee named "Fortune" performing fellatio on a mentally-disabled individual who worked at the Company from time-to-time (the "MAN" in the following exchange):

> [SPIEWAK]: (Inaudible)
>
> [MAN]: Yeah?
>
> [SPIEWAK]: Why is Fortune like a computer?
>
> [SPIEWAK]: You don't appreciate it until she goes down on you.
>
> [MAN]: Me?  Who Fortune?
>
> [SPIEWAK]: Yeah on you.  When was the last time anybody went down on you?
>
> [MAN]: Like um, a few months ago.
>
> [SPIEWAK]: Oh yeah?  What was the person's name?

[MAN]: Lottie Jax (ph.)

[SPIEWAK]: Jack? Oh, I didn't know you went that way. Okay, enjoy.

[MAN]: Okay.

[MAN]: What are you going to tell Fortune what I just said?

[SPIEWAK]: No, she's gotta go down on you first.

52.     For obvious reasons, Spiewak elected not to defend against the allegations, and instead caused the Company to settle the former employee's claims.  Upon information and belief, Spiewak caused the Company to pay the former employee several hundred thousand dollars.

53.     Inasmuch as the former employees' claim resulted solely from Spiewak's misconduct, he is required to reimburse the Company for the harm suffered as a result of his outrageous conduct.

## COUNT I
## RICO § 1962(c)
### (Against Inside Defendants)

54.     The allegations of paragraphs 1 through 51 are incorporated here.

55.     Kwik Ticket, Inc. is an enterprise engaged in and whose activities affect interstate commerce.

56.     The Inside Defendants are employed by or associated with the enterprise.

57.     The Inside Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Kwik Ticket, Inc.

58.     Pursuant to and in furtherance of their fraudulent scheme, the Inside Defendants committed multiple related acts of mail fraud, wire fraud, money laundering, and commercial

bribery, proscribed by 18 U.S.C. §§ 1341,1343, 1956, and N.Y. Penal Law § 180.03, respectively. In particular, defendants devised and intended to devise a scheme or artifice to defraud, and to obtain money by means of false and fraudulent pretenses and representations, and for the purpose of executing such scheme or artifice or attempting so to do, placed in and received from the U.S. Mail and private interstate courier documents in connection with such schemes and fraud, in violation of 18 U.S.C. § 1341. Similarly, for the purpose of executing such schemes, defendants transmitted by means of wire and radio, in interstate commerce, writings, signs, signals, pictures, and sounds, in violation of 18 U.S.C. § 1343. Moreover, the defendants engaged in money laundering as defined by 18 U.S.C. § 1956. In addition, upon information and belief, defendants used some of the cash generated by their schemes to bribe buyers employed by corporate entities. Defendants conducted many financial transactions, knowing that the property involved was the proceeds of fraudulent activity, with the intent to (i) promote such activity; (ii) evade income taxes; and (iii) conceal and disguise the nature, source, ownership or control of the ill-gotten funds.

59.     The acts set forth in paragraphs 23 through 37 above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

60.     The Inside Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

61.     As a direct and proximate result of the Inside Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), plaintiff Kwik Ticket, Inc. has been injured in its business and property in that the Inside Defendants' fraudulent scheme enabled them to loot the Company's assets for their personal gain.

## COUNT II
## RICO § 1962(d)
## (Against All Defendants)

62.     The allegations of paragraphs 1 through 59 are incorporated here by reference.

63.     Defendants agreed and conspired to violate 18 U.S.C. § 1962(c).   Such agreement included the manufacture of fraudulent invoices; issuance of Company checks to "pay" those fraudulent invoices; cashing said checks and retaining the funds; the maintenance of fraudulent books and records to make it appear that vendors were being paid in the ordinary course of business, when in fact the sums represented by the invoices were embezzled by the Inside Defendants; and the generation of materially false and misleading financial statements by an accountant for the purpose of concealing the fraud from the Company.

64.     Defendants have intentionally conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the Kwik Ticket Inc. enterprise through a pattern of racketeering activity.  Defendants knew that their predicate acts were part of a pattern of racketeering activity, and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

65.     As a direct and proximate result of the defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Kwik Ticket Inc. has been injured in its business and property in that defendants' conspiracy enabled the Inside Defendants to loot the Company's assets for their personal gain.

## COUNT III
## Breach of Fiduciary Duty
## (Against Larry Spiewak)

66.     The allegations of paragraphs 1 through 63 are incorporated here by reference.

67.     As the purported President of Kwik Ticket Inc., a director, and 50% shareholder, Larry Spiewak owed Kwik Ticket Inc. fiduciary duties, including the duties of care, loyalty, and to act honestly and in good faith.

68.     For the reasons stated above, Mr. Spiewak repeatedly breached fiduciary duties to the Company.

69.     As a direct result of these breaches of fiduciary duty, the Company suffered harm.

**COUNT IV**
**Breach of Fiduciary Duty**
**(Against Malkah Jacobovits)**

70.     The allegations of paragraphs 1 through 63 are incorporated here by reference.

71.     As the office manager and an employee of Kwik Ticket Inc., Malkah Jacobovits owed Kwik Ticket Inc. – not Larry Spiewak -- fiduciary duties, including the duties of care, loyalty, and to act honestly and in good faith.

72.     For the reasons stated above, Ms. Jacobovits repeatedly breached fiduciary duties to the Company.

73.     As a direct result of these breaches of fiduciary duty, the Company suffered harm.

**COUNT V**
**Breach of Fiduciary Duty**
**(Against Joel Boikess)**

74.     The allegations of paragraphs 1 through 71 are incorporated here by reference.

75.     As the outside Certified Public Accountant of Kwik Ticket Inc., Joel Boikess owed fiduciary duties to Kwik Ticket Inc. to prepare honest and accurate financial statements.

76.     In breach of his fiduciary duties, over the course of several years, Boikess knowingly prepared, approved and signed false and fraudulent financial statements to cover up the criminal conduct engaged in by the Inside Defendants.

77.     As a direct result of these breaches of fiduciary duty, the Company suffered harm.

**COUNT VI**
**Aiding and Abetting Breach of Fiduciary Duty**
**(Against All Defendants)**

78.     The allegations of paragraphs 1 through 75 are incorporated here by reference.

79.     As alleged above, Larry Spiewak, Malkah Jacobowits and Joel Boikess owed fiduciary duties to the Company.  In connection with each such actor's breach of fiduciary duties, each of the other defendants knowingly induced, participated, assisted, aided and abetted in the breach of fiduciary duty.

80.     The Company suffered damages as a result of the breach of fiduciary duties.

**COUNT VII**
**Fraud**
**(Against Larry Spiewak and Malkah Jacobovits)**

81.     The allegations of paragraphs 1 through 78 are incorporated here by reference.

82.     Defendants Larry Spiewak and Malkah Jacobovits generated fraudulent invoices and maintained fraudulent books and records to enable them to extract funds from the Company under the guise of legitimate business expenditures.

83.     In so doing, these defendants acted outside the scope of their proper authority for their personal interests and with an intent to defraud.

84.     In paying the invoices and otherwise honoring the checks, the Company, as an entity with a separate juridical existence from its 50% owner Larry Spiewak, reasonably relied on the fraudulent documents prepared by Larry Spiewak and Malkah Jacobovits.

85.     As a result of the foregoing, the Company suffered damages.

## COUNT VIII
## Aiding and Abetting Fraud
## (Against Mindy Spiewak and Joel Boikess)

86. The allegations of paragraphs 1 through 83are incorporated here by reference.

87. As alleged above, Larry Spiewak and Malkah Jacobovits committed fraud against the Company.

88. In connection with the foregoing fraud, defendants Mindy Spiewak and Joel Boikess knowingly induced, participated, assisted, aided and abetted the fraud.

89. The Company suffered damages as a result of the fraud, and the aiding and abetting thereof.

## COUNT IX
## Breach of Contract
## (Against Larry Spiewak)

90. The allegations of paragraphs 1 through 87 are incorporated here by reference.

91. Larry Spiewak and Florence Shamah entered into agreements concerning, among other things, the compensation and other benefits to which they were respectively entitled.

92. In breach of those agreements, Larry Spiewak deprived plaintiff of her fair share of the Company profits and benefits and compensation, while paying himself an excessive amount.

93. As a result of these breaches, Florence Shamah suffered damages.

## COUNT X
## Repayment Of Legal Fees Improperly Charged To The Company By Spiewak

94. The allegations of paragraphs 1 through 91are incorporated here by reference.

95. Upon information and belief, Spiewak has paid the attorneys defending him in this action with funds belonging to Kwik Ticket. Such sums are presently in the several-hundred thousands of dollars.

96.     Spiewak's legal fees are personal expense, and not a Company expense.

Accordingly, Spiewak had no right to invade corporate assets to pay his personal legal expenses.

97.     To the extent Spiewak would claim that he is entitled to "advance"

indemnification for legal expenses, that has not been authorized by the Company (of which

plaintiff has 50% of the voting power), and violates the indemnification provisions set forth in

NY Business Corporation Law §§ 731-725.

98.     By reason of the foregoing, Spiewak should be required to repay the Company all

of the legal expenses he charged to the Company, or had the Company pay, in respect of the

defense of this action.

### COUNT XI
### Repayment To The Company By Spiewak For Any Amounts
### Expended In Connection With The Discrimination Allegations And Settlement

99.     The allegations of paragraph 1 through 96 are incorporated here by reference.

100.     Solely as a result of Spiewak's outrageous conduct toward employees, and

creation and fostering of a hostile work environment in violation of federal, state and city anti-

discrimination law, a former employee threatened to bring an action against Spiewak and the

Company.

101.     Upon information and belief, Spiewak caused the Company to expend sums to

settle the former employee's charges.  Indeed, in light of the evidence, Spiewak could hardly

deny the allegations.

102.     Since Spiewak's misconduct was the sole cause of the claims against the

Company, he should not have authorized the use of any Company funds in the defense of the

allegations or the payment of a settlement.

103.     Accordingly, Spiewak should be compelled to repay to the Company all such amounts.

## COUNT XII
### Conversion
### (Against Larry Spiewak and Malkah Jacobovits)

102.     The allegations of paragraphs 1 through 101 are incorporated here by reference.

103.     Without authorization, defendants Larry Spiewak and Malkah Jacobovits exercised the right of ownership over property belonging to the Company, to the exclusion of the Company's rights.

104.     As a result of this conversion of property, the Company suffered damages.

## COUNT XIII
### Unjust Enrichment
### (Against All Defendants)

105.     The allegations of paragraphs 1 through 104 are incorporated here by reference.

106.     As a result of the foregoing, defendants were unjustly enriched and, in equity and good conscience, should be required to return to the Company their ill-gotten gains.

107.     In the case of Larry Spiewak and Malkah Jacobowits, they should be required to return all funds they removed from the Company which were not legitimate business expenses. Since Mindy Spiewak directed her husband to engage in the misconduct, and benefited therefrom, she too should be required to restore the stolen funds.  Finally, Joel Boikess should be required to disgorge all fees he allegedly earned during the period of his faithlessness.

## COUNT XIV
### (Against All Defendants)
### Preliminary And Permanent Injunction

108.     The allegations of paragraphs 1 through 107 are incorporated here by reference.

109.     Defendants have been engaged in an ongoing pattern of fraudulent, criminal conduct to the detriment of the Company.

110.     Defendants' conduct has caused – and absent an injunction, will continue to cause – irreparable injury to the Company.

111.     Accordingly, defendants should be preliminarily and permanently enjoined from engaging in fraudulent conduct against the Company, or taking any actions that are not properly authorized by the Company, including without limitation causing the Company to pay Larry Spiewak's legal fees.

**WHEREFORE**, plaintiff demands the following relief:

1.     On Counts I and II, treble damages and attorneys' fees in an amount to be determined, but believed to exceed $3 million.

2.     On Counts III, IV, V, VI, VII, VIII, IX, X, XI, XII, and XIII, an accounting, disgorgement of ill-gotten gains, punitive damages, and attorneys' fees in an amount to be determined.

3.     On Count XII, a preliminary and permanent injunction enjoining defendants from engaging in fraudulent conduct against the Company, or taking any actions that are not properly authorized by the Company.

4.     On all counts, such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff demands trial by jury on all issues so triable.


**M A T A L O N PLLC**

By: _s/Joseph Lee Matalon_____
       Joseph Lee Matalon
450 Seventh Avenue, 33rd Floor
New York, New York 10123
(212) 244-9000
*Attorneys for Plaintiff*
*Kwik Ticket Inc., by its 50% owner,*
*Florence Shamah, and Florence Shamah,*
*Individually*

Dated:  June 11, 2021