**M A T A L O N PLLC**
**450 Seventh Avenue – 33rd Floor**
**New York, New York 10123**
**(212) 244-9000**
*Attorneys For Plaintiff*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
:
**KWIK TICKET INC., by its 50% owner,**    :  **Docket No. 1:20-cv-1201(FB) (SJB)**
**FLORENCE SHAMAH,**    :
:
            **Plaintiff,**    :
:
    **-against-**    :
:
**LARRY SPIEWAK, MINDY SPIEWAK,**    :
**MALKAH JACOBOVITS and JOEL BOIKESS,**  :
:
          **Defendants.**    :
-------------------------------------------------------------X

### PLAINTIFF'S MEMORANDUM OF LAW
### IN OPPOSITION TO THE INSIDE DEFENDANTS'
### MOTION TO COMPEL ARBITRATION, TO DISMISS, AND TO STRIKE

September 23, 2021

TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

FACTS .........................................................................................................................2

ARGUMENT ...............................................................................................................8

I.     THE COURT SHOULD DENY
      THE MOTION TO COMPEL ARBITRATION ...........................................8

     A. There Is No Written Arbitration Agreement ....................................8

     B. None Of The Disputes In This Litigation Relate
        To Or Arise Out Of The Draft Shareholder's Agreement ...............14

     C. Defendants Are Judicially Estopped From
        Asserting That There Is A Binding Arbitration Clause ...................17

II.    THE MOTION TO DISMISS SHOULD BE DENIED ..............................19

     A. The Amended Complaint Pleads An
        "Enterprise" Distinct From The Corrupting "Persons" ...................20

     B. Plaintiff Adequately Alleges RICO Predicate Acts..........................23

     C. The Pleaded Predicate Acts Are Related
        And Satisfy The Continuity Requirement .......................................26

     D. Defendants Misconstrue The Commerce Requirement ...................29

     E. The Amended Complaint Adequately Pleads
        Violation Of The RICO Conspiracy Statute .....................................30

     F. The Amended Complaint Readily Pleads Conversion .....................31

     G. The Count Seeking A Permanent Injunction Should Not Be Dismissed .......32

III.   SPIEWAK'S OFFENSIVE COMMENTS ARE RELEVANT AND
      SHOULD NOT BE STRICKEN UNDER RULE 12(f)............................33

CONCLUSION .........................................................................................................35

i

## PRELIMINARY STATEMENT

The "Inside Defendants" – Larry Spiewak, Malkah Jacobovits, and Mindy Spiewak – move to compel arbitration based on a non-existent "agreement." They rely solely on Isaac Shamah's personal copy of a partially-signed draft shareholder's agreement which was executed only by himself and Spiewak in 1980. The shareholder's agreement was not signed by plaintiff Florence Shamah (although she was listed as a party thereto), nor was it signed by her late husband David Shamah, from whom she inherited her 50% ownership of Kwik Ticket Inc. Nor did Florence or David even know about the draft agreement. Moreover, there is no dispute that the agreement was never followed and never governed any aspect of the corporation. In short, there is no written agreement to arbitrate, as is required to compel that form of dispute resolution.

In any event, and contrary to defendants' argument, the arbitration sentence in the draft agreement is not broad, but is narrowly limited to disputes "relating to or arising *out of this agreement*" -- and there are none. So even if there is a binding arbitration agreement, it does not encompass the present action. And finally, defendants are judicially estopped from claiming there is an effective agreement with broad reach because, consistent with their written position that there was no shareholder's agreement, they sought and received *judicial*, not *arbitral*, relief against the sole Shamah signatory, Isaac Shamah. Thus, for many different reasons, arbitration should not be compelled.

Defendants also try their hand at dismissal of certain discrete causes of action, as well as a motion to strike certain allegations. For the reasons set forth below, those branches of the motion should likewise be denied.

# FACTS

This section is divided into two parts.  The first relates to the motion to compel arbitration, the second to the motion to dismiss and to strike (essentially a summary of the Amended Complaint).

## Facts Relevant To Arbitration

In the early 1970s, David Shamah, late husband of plaintiff Florence Shamah (and father of Florence's agent Isaac Shamah), founded a corporation named Florence Paper Corp.  In 1979, Larry Spiewak, then 25 years old and a former classmate of Isaac, paid a sales call to Florence Paper.  At Isaac's urging (also 25 years old, and then a Florence Paper employee), David offered to put Spiewak in business selling tagging guns and related supplies to retailers, with the Shamah family to own half, and Spiewak the other half.  Spiewak gratefully accepted the proposition (Shamah Dec. ¶¶ 4-5).

David asked his son Isaac to set up the business legally, and Isaac contacted Florence Paper's attorney to make the necessary filings.  A New York corporation named Swift Ticket, Inc. was set up on December 4, 1979, and began business immediately.  (The name was changed to Kwik Ticket Inc. in 1982.)  Upon formation, Spiewak owned 50% of the stock, David Shamah 25%, and the four Shamah children and a cousin each owned the remaining 25% in equal shares (5% each) (Shamah Dec. ¶ 7).

A couple of months later, Isaac mentioned to Uncle Izzy that his family had formed a business with a non-family member.  The uncle suggested that they enter into a shareholder's agreement.  Isaac was not familiar with the concept, as Florence Paper did not have a shareholders' agreement.  Isaac contacted the same attorney and asked him to prepare a simple

shareholder's agreement containing whatever terms he thought was appropriate (Shamah Dec. ¶ 8).

A short time afterward, Isaac received a draft agreement from the attorney.  It contained a signature line for all of the shareholders, as well as for Florence.  The intent was for it to be signed by all involved.  The preamble identifies eight named individual parties, and states that it is an "Agreement . . . among" those eight parties.  It states that the "parties desire to enter into an agreement governing certain of their rights with respect to each other," and that the agreement was made "in consideration of the mutual covenants of the parties."  The agreement contains numerous references to the "Shareholders," expressly defined in the draft agreement as "the individual parties to the agreement," that is, the eight listed individuals.  Section 11 contains a one-sentence arbitration clause, reading: "Any dispute relating to or arising out of this agreement shall be resolved by arbitration before three arbitrators in the City of New York under the rules then obtaining of the American Arbitration Association." (Shamah Dec. ¶ 9 & Exh. B)

Isaac gave the document to Spiewak, who signed on his own behalf and purportedly on behalf of the corporation.  Isaac signed it as well, and put the document in a personal file, whereupon he quickly forgot about it.  Isaac did not discuss the document with any of the other Shamah-side shareholders, including his father David, nor did he discuss it with his mother Florence.  No copies were made.  Isaac still has the original, ink-signed version in his possession (signed only by himself and Spiewak).  That is the only version in existence.   In the 40+-year history of the corporation, the draft "agreement" was never implemented or followed (Shamah Dec. ¶¶ 9-12).

In 1985, the Shamah children and their cousin transferred their shares to David, who became the sole Shamah-side shareholder, owning 50% of the corporation.  David passed away in 2001, and his wife Florence inherited David's shares (Shamah Dec. ¶¶ 12-13).

In March 2016, Isaac met with Spiewak to see if the latter was interested in buying out his mother's shares.  At that meeting, Isaac gave to Spiewak a copy of the draft shareholder's agreement.  Spiewak stated that he did not remember it all, and that it was not applicable (Shamah Dec. ¶ 14).

In March 2020, Florence's attorney, mistakenly believing that the shareholder's agreement provided to him by Isaac was merely a counterpart, and that the company had a fully-signed agreement, sought to invoke the director-election provisions thereof for his client's benefit.  In response, the corporation's attorney rejected that effort, replying: "as you are fully aware, the referenced [shareholder's] agreement has not been in use for the forty (40) years that the corporation has been in existence.  Accordingly, under applicable law, the agreement does not control governance of the entity." (Matalon Dec. ¶¶ 3-5 & Exhs. A, B)

Consistent with that position, also in 2020, Spiewak caused the corporation to commence an action – not an arbitration -- in New York State court against Isaac Shamah, an actual signatory to the draft agreement, as well as Florence Shamah.[1]  The corporation sought and received judicial relief as a direct result of its position that arbitration was not required, in the form of a TRO and preliminary injunction against Isaac enjoining him from holding himself out as an officer of the corporation and accessing its offices (Shamah Dec. ¶ 15 & Exhs. C, D & E).

---

[1] Florence was later voluntarily dismissed (Shamah Dec. ¶ 15).

Relying solely on Isaac's partially-signed draft shareholder's agreement, defendants Larry Spiewak, Malkah Jacobovits and Mindy Spiewak now move to compel arbitration of the present dispute.

**Facts Relevant To Motion To Dismiss And To Strike**

As is relevant to the motion to dismiss and to strike, the Amended Complaint, together with its exhibits, alleges as follows:

Kwik Ticket Inc. is a New York corporation formed under the name Swift Ticket in 1979, and renamed to its present appellation in 1982. At all times defendant Larry Spiewak has owned 50%, and members of the Shamah family the other 50%. Since 2001, when David Shamah passed away, Florence Shamah, an 88-year old widow, has owned half the company. The company purchases tags, plastic barbs, labels, and related goods, and sells them primarily to retailers (Am. Compl. ¶¶ 9, 10, 18).

Since 2001, and with the support and assistance of the office manager Malkah Jacobovits, his wife Mindy, and the outside accountant Joel Boikess, defendant Larry Spiewak, the President, has been actively engaged in ongoing fraud to loot the company and evade income taxes. This was only discovered in or about 2019 by plaintiff Florence Shamah's son and attorney-in-fact, Isaac Shamah, when he started asking questions and demanding documents as a result of an IRS audit. Previously, Florence had trusted Spiewak to deal with the company's business honestly and fairly (Am. Compl. ¶¶ 1, 19, 21, 22, 23, 24, 25).

What the Shamahs discovered was nothing short of astounding– a massive fraud and theft of Company funds dating back as much as 20 years. The company's records are rife with phony "vendor" invoices created by the office manager Jacobovits at the direction of Spiewak. Those invoices were (mis)recorded as legitimate business transactions, which were then paid by

company check.  But instead of the checks having been drawn to the account of the indicated

vendor – as was set forth in the company's books and records – in actuality the underlying

checks were instead made payable to "Cash."  Typically, Jacobovits would endorse the checks,

go to the bank, cash them, and then divvy up the resulting cash currency among herself, and the

Spiewaks (Am. Compl. ¶¶ 25-37).

The outside accountant Joel Boikess, over the course of several years, was aware this was

going on, and knowingly prepared, approved and signed false and fraudulent financial statements

to cover up the criminal conduct engaged in by the other defendants (Am. Compl. ¶¶ 1, 75, 76).

The Amended Complaint sets forth a variety of specific vendors and transactions, and to

avoid any suggestion that the fraud was not pleaded particularly, provides copies of various

invoices, and of the checks made out to cash containing Jacobovits's endorsements.  One such

vendor is PMX Freight Systems, a trucker, which purportedly sold "labels" or "tags" to Kwik

Ticket.  Although Kwik Ticket formerly did business with PMX, it has not done so for at least

ten years – but one could not tell from examining the invoices.  Spiewak and Jacobovits craftily

created fake invoices, which were then paid by checks made out to "cash." (Am. Compl. ¶¶ 27-

29 & Exh. C)

A similar pattern (and exhibit evidence) exists regarding supposed transactions with

Basic Office Essentials, a variation on the name of an entity formed by Spiewak in 2001, the

year David Shamah passed away.  The amended complaint also chronicles similar fraudulent

schemes involving "Morris Trucking."  Kwik Ticket must also have had a problem keeping its

carpet tidy, because it created a series of false $500 invoices from "Blanca Cleaners" for bi-

weekly carpet cleaning.  And not content to merely pay the face amount of those fake invoices,

the June 20, 2013 $500 invoice, for example, was paid by *two* checks payable to cash – one for $3,500 and the other for $4,000 (Am. Compl. ¶¶ 30-36 Exhs D, E, F, G, H, I & J).

Kwik Ticket also issued weekly checks for "petty cash" in amounts ranging from a few hundred dollars, to over a thousand dollars, and at least two for $5,000.  These were not used to pay legitimate company expenses, although recorded on the company's books and records for that purpose.  The money was stolen by defendants (Am. Compl. ¶ 37 & Exh. K).

A separate scheme involved the Spiewaks' long-term pattern and practice of paying virtually every household expense by credit cards issued in the name of the company, in their own names, and others.  They would then have Kwik Ticket pay these cards in full each month, and record the charges as Kwik Ticket business expenses in categories such as "Office Expense," "Purchases," "Auto," and "Meals and Entertainment. ."  The complaint alleges that over the past 20 years, this form of theft is in the millions of dollars (Am. Compl. ¶ 38).

The complaint expressly alleges that the defendants employed the U.S. Mail and interstate wire facilities in connection with their frauds.  In addition, the complaint alleges that some of the cash was used to pay bribes to buyers, and that the alleged conduct also constitutes money laundering and tax evasion (Am. Compl. ¶ 58).

The amended complaint alleges that defendants are liable for RICO violations under 18 U.S.C. § 1962(c) (Count I), and RICO conspiracy under 18 U.S.C. § 1962(d) (Count II).

Count XI also seeks, on behalf of Kwik Ticket, to require Spiewak – as the sole wrongdoer -- to repay to the corporation sums it expended in settling a former employee's claims of hostile workplace discrimination.  The Amended Complaint sets forth the text of audio recordings in plaintiff's possession, made without Spiewak's knowledge, evidencing Spiewak's atrocious workplace misconduct.  Although Speiwak's racist and sexist comments are obviously

embarrassing to him, they are directly relevant to the claims at issue, and for the reasons set forth below, should not be stricken.[2] (Am. Compl. ¶¶ 49-53; Exhs. N, O)

The Amended Complaint also sets forth a series of New York common law and statutory claims, only two of which (Conversion – Count XII, and Injunction, Count XIV) are the subject of the Inside Defendants' motion to dismiss.  The conversion count alleges that, without authorization, Spiewak and Jacobovits exercised the right of ownership over property belonging to the corporation, to the exclusion of the corporation's rights.  Plaintiff also claims that she is entitled to injunctive relief enjoining ongoing wrongdoing causing irreparable injury. Since the remaining counts are not subject to a dismissal motion, the allegations will not be summarized here.

## ARGUMENT

## I.

## THE COURT SHOULD DENY THE MOTION TO COMPEL ARBITRATION

### A.    There Is No Written Arbitration Agreement

To compel arbitration, the Federal Arbitration Act, by its own terms, requires a "written" agreement to arbitrate. 9 U.S.C. § 2.  "Arbitration is strictly 'a matter of consent,'" and courts may not compel arbitration unless the parties have agreed to submit to arbitration. Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 299 (2010) (citation omitted).  Accord, AT & T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 648 (1986).  The parties seeking to invoke the FAA – here, the defendants -- bear the burden of proving that an agreement to

---

[2] The ECF system does not presently provide for the uploading of audio exhibits; otherwise, the recordings would have been uploaded to the docket.  Of necessity, the recordings were uploaded to an outside venue (YouTube.com).  However, they can only be accessed by those having the specific URL address, which was disclosed only in the amended complaint, but not elsewhere.  The tapes cannot be located or accessed by a general YouTube search.

arbitrate exists.   Hines v. Overstock.com, Inc., 380 F. App'x 22, 24 (2d Cir. 2010); Camara v.

Mastro's Rests. LLC, 952 F.3d 372, 373 (D.C. Cir. 2020).

Arbitration is "a matter of contract," Howsam v. Dean Witter Reynolds, Inc., 537 U.S.

79, 83 (2002), and "ordinary, state-law principles" determine whether a contract to arbitrate has

been made. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995).  Notably, in

making that determination, there are no presumptions in favor of arbitrability, no strong federal

policies mandating arbitration, no "thumbs on the scale."  See Calderon v. Sixt Rent A Car, LLC,

5 F.4th 1204, 1212 (11th Cir. 2021).  "When the dispute is about whether there is a valid and

enforceable arbitration agreement in the first place, the presumption of arbitrability falls away."

Riley Mfg. Co. v. Anchor Glass Container Corp., 157 F.3d 775, 779 (10th Cir. 1998).  Thus, only

after a court has determined that an arbitration agreement subject to the FAA exists do any of the

pro-arbitration policies come into effect.  Id.

Defendants have utterly failed to prove that plaintiff Florence Shamah is bound by an

arbitration agreement.  The sole basis for the claimed agreement appears in one sentence of a

draft shareholder's agreement that never came into effect.

The corporation now named Kwik Ticket Inc. was formed on December 4, 1979 and

immediately began business (Shamah Dec. ¶ 7).  Indisputably, there was no shareholder's

agreement at that time – the purported shareholder's agreement being dated more than four

months later – and the corporation could (and did) function without one, as did David Shamah's

other business, Florence Paper Corp. (Shamah Dec. ¶¶ 7-8 and Exhs. A, B).[3]  Isaac Shamah

procured the draft agreement from counsel months after corporate formation, on the advice of his

---

[3] Indeed, the document itself recites, in retrospective language, that the "Corporation has been formed," not that it will prospectively "be formed" or was contemporaneously "being formed." (Shamah Dec. Exh. B)

uncle Izzy (who was not part of the company), but did not discuss it with his father or any of the other four shareholders on the Shamah side (Shamah Dec. ¶¶ 8-11).  Nor did he discuss it with his mother Florence who, by the express terms of the draft agreement, was supposed to be a party and signatory thereto (Shamah Dec. ¶ 11). Instead, after obtaining Larry Spiewak's signature and then signing it himself, the 25-year-old Isaac stuck it in a personal file and forgot about it for decades (Shamah Dec. ¶ 9). In these circumstances, it is impossible to conclude that Florence Shamah is bound by an agreement to arbitrate, either directly as a party to it, or indirectly by reason of having inherited David's shares, because David too never signed, or even knew about, the purported "agreement."  (Shamah Dec. ¶11)

On its face, the shareholder's agreement could not become effective without it being signed by all of the intended parties thereto.  See Scheck v. Francis, 26 N.Y.2d 466, 469-70 (1970).  The preamble identifies 8 named individual parties, and states that it is an "Agreement . . . among" those 8 parties -- not merely two individual parties. It states that the "*parties* desire to enter into an agreement governing certain of their rights *with respect to each other*," and that the agreement was made "in consideration of the *mutual covenants of the parties*." (In this Memorandum, all emphasis is added unless otherwise indicated.)  Clearly, the agreement contemplated execution by all of the parties.  In fact, the agreement contains numerous references to the "Shareholders," expressly defined in the draft agreement as "the individual parties to the agreement," that is, the eight listed individuals.   Moreover, it would make no sense, and would be completely unworkable, to have a binding agreement among only two of the shareholders, given that the agreement contemplates the rights of a collective Shamah Group, owning 50% of the company, as against Spiewak, owning the other 50%, and vice versa.  Yet

only 10% of the Shamah Group interests (that is, Isaac) signed; the other 90% (5 others) didn't even know about it, let alone sign it (Shamah Dec. ¶¶ 9, 11 & Exh. B).[4]

Further evidence that there is no valid agreement lies in the fact that it was never delivered to the corporation or Spiewak, but remained in Isaac Shamah's personal files all these decades (Shamah Dec. ¶¶ 9, 10).  Under New York law, mere execution of a document, without delivery, is evidence that no contract has been formed.  See, e.g., Schwartz v. Greenberg, 304 N.Y. 250, 254-55 (1952).

Defendants' affirmative position to compel arbitration is based solely on the presumed existence of a binding, executed shareholder's agreement containing an arbitration clause (Def. Mem. 9-10).  Yet defendants rely solely on Isaac Shamah's copy of the partially-signed document; they do not submit any copy of their own, blink the absence of the required signatures, and say nothing about the circumstances of the alleged shareholder's agreement. Whether Spiewak's silence on these critical points is motivated by a concern about waiver of his Fifth Amendment privilege against self-incrimination, or even because he has no recollection of the document (as he admitted to Isaac Shamah in 2016) (Shamah Dec. ¶ 14), the consequence is the same:  defendants have fallen far short of sustaining their evidentiary burden of proving the existence of a binding, written, arbitration clause.

Any attempt by defendants to backfill in reply, and argue that there could have been an oral agreement among everyone, or a shareholder's agreement ratified by conduct, would be too little, too late.  Since it was defendants' burden to make a prima facie showing, they cannot make new arguments or submissions in in *reply* papers.  See, e.g. Le Metier Beauty Inv. Partners LLC

---

[4] Incidentally, Spiewak's signature purportedly on behalf of the corporation is meaningless in the absence of evidence that he was authorized by the corporation to do so (and there is none).  Nor does such signature change the analysis.

v. Tribeca, 2015 U.S. Dist. LEXIS 22345, *18 n.4 (S.D.N.Y. 2015) and authorities cited therein.
Moreover, even if those arguments were made initially, they would fail.  First, as already noted,
the draft shareholder's agreement contemplated written execution by all of the parties, and in the
absence thereof, there can be no binding agreement. Second, the draft agreement, in Section 3(a),
mandates that shareholders vote their shares in a certain manner.  Under New York law, any such
agreement must be in writing and signed by the parties. N.Y.  Bus. Corp. L. § 620(a); Shea v.
Hambro Am., 200 A.D.2d 371, 372 (1st Dept. 1994) (BCL § 620(a) "requires that all voting
agreements between shareholders be in writing and signed by the parties to the agreement in
order be valid and enforceable.").  Similarly, the FAA requires a written arbitration agreement. 9
U.S.C. § 2.   Third, besides Isaac, none of the Shamah-side shareholders even knew about the
agreement, so there is no way they could have "orally" agreed to it.  Finally, it is undisputed that
the terms of the non-agreement were never followed (Shamah Dec. ¶ 12; Matalon Dec. ¶ 5).
Indeed, the attorney retained by Spiewak to represent the corporation against the Shamahs (and
with no disagreement from Spiewak's personal attorney in this litigation) expressly said as much
even after this litigation commenced, confirming that, "as you are fully aware, the referenced
[shareholder's] agreement has not been in use for the forty (40) years that the corporation has
been in existence.  Accordingly, under the applicable law, the agreement does not control
governance of the entity." (Matalon Decl. ¶¶ 4-5 and Exhs. A, B). Moreover, and as discussed
further below, Spiewak necessarily took the position that there was no arbitration agreement
when he sought (and obtained) a TRO and preliminary injunction in state court against the only
Shamah signatory, Isaac Shamah (Shamah Dec. ¶ 15).  It is therefore the zenith (or nadir?) of
hypocrisy for defendants to now argue there is a valid and enforceable shareholder's agreement.

Naturally, defendant's presentation starts with the mere *assumption* that there is a binding arbitration agreement (Def. Mem. 9), and then quickly moves on to arguing that the present disputes fall within its terms (Def. Mem. 10-12), and that non-signatories may claim the benefit thereof (Def. Mem. 12-13).  All this without pausing to address the glaring threshold issue of whether there is any effective agreement to arbitrate at all.   Indeed, because it is manifest that Florence Shamah never agreed to arbitrate, it seems that defendants are suggesting that the plaintiff here is actually Isaac Shamah (see Def. Mem. 3 [stating that "Plaintiff" is a signatory]), but of course the plaintiff is his mother Florence, the 50% shareholder. Isaac is merely his mother's agent (she could have appointed anyone), and Isaac does not have standing in his own right to precipitate a derivative action, or claim that his individual rights as a shareholder were trampled, because he is not even a shareholder.   Even defendants slip up on their feeble suggestion that Isaac is the plaintiff, describing him on page 4 of their Memorandum as "plaintiff's son," and correctly referring to plaintiff as "she" and "her" on page 19.  Clearly, there is simply no line of reasoning which compels Florence Shamah to arbitrate, including the notion that Isaac is the plaintiff.

To be sure, there are certain theories upon which a non-signatory to an agreement may be required to arbitrate, some of which defendants try to invoke for the benefit of Mindy Spiewak and Malkah Jacobovits (Def. Mem. 12-13); See, e.g., Thomson–CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 776-77 (2d Cir.1995) (identifying "five theories for binding non signatories to arbitration agreements: 1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." ).[5]  However, under each of those theories, there must first

---

[5] For obvious reasons, the outside accountant Joel Boikess does not seek to compel arbitration or stay the action against him – he only moves to dismiss for failure to state a claim.  So if any

be a binding and effective underlying agreement to arbitrate, and the issue becomes whether the

non-signatory is also bound or may benefit from the agreement.  But none of those legal

principles can be used to *create* an arbitration agreement in the first instance where one does not

otherwise exist.

Applying ordinary state law contract principles, then, it is plain that Florence Shamah is

not a party to or bound by an agreement to arbitrate, and accordingly arbitration may not be

compelled or a stay of this action ordered.

**B.      None Of The Disputes In This Litigation Relate**
**          To Or Arise Out Of The Draft Shareholder's Agreement**

Even if the Court somehow concludes that defendants have sustained their burden, as a

matter of law, of proving that Florence Shamah is bound by the draft shareholder's agreement

(including the arbitration sentence therein), this litigation does not involve a dispute relating to or

arising *out of that agreement*.  Thus, in any event, arbitration may not be ordered.

In full, the arbitration sentence reads: "Any dispute relating to or arising *out of this*

*agreement* shall be resolved by arbitration before three arbitrators in the City of New York under

the rules then obtaining of the American Arbitration Association."  (Shamah Dec., Exh. B., § 11)

Unlike the sole case cited by defendants, <u>Maresca v. La Certosa</u>, 172 A.D.2d 725, 726 (2d Dept.

1991); Def. Mem. 10, wherein the clause broadly provided for arbitration "relating to or arising

out of *the affairs of the Corporation* or this Agreement," the arbitration clause here, by contrast,

is narrowly limited to disputes strictly involving the shareholder's agreement -- and there are

none, try as defendants might to shoehorn the dispute into the draft agreement.  Indeed, contrary

to defendants' argument (Def. Mem. 10), the introductory phrase "any dispute" does not serve to

---

claims against him survive his motion, litigation will proceed in this Court against him,
regardless if there is an arbitration with any other defendants.

make this a broad clause, because that language is then limited and qualified by the immediately following words "relating to or arising *out of this agreement*."  Thus, unless the Court finds that plaintiff is trying to invoke rights immediately arising out of a breach of the purported shareholder's agreement – and despite her express representation herein that she is not -- the dispute is not arbitrable. E.g., Calderon v. Sixt Rent A Car, LLC, 5 f.4TH 1204, 1213 (11th Cir. 2021) (in determining whether, for arbitration purposes, a dispute arises out of an underlying contract, courts generally consider whether the dispute was an immediate, foreseeable result of the performance of contractual duties).

The amended complaint pleads a series of derivative and direct claims against defendants having nothing to do with the purported shareholder's agreement.  She alleges claims arising under statutory law (including RICO), and New York common and contract law, strictly as a 50% shareholder -- a status she obtained upon inheriting her husband's shares in 2001 (Shamah Dec. ¶ 13).  There are simply no claims or disputes relating to anything contained in the alleged shareholder's agreement, or arising out of the rights allegedly established in it; the amended complaint does not even mention that agreement.    Stated differently, plaintiff's complaint would exist in precisely the same form and substance whether or not there was a shareholder's agreement – a purported agreement allegedly entered into more than four months *after* the corporation was formed and began business (meaning that David's and the other shareholders' status arose from the formation of the corporation in December 1979, not under the putative shareholder's agreement in March 1980). (Shamah Dec. ¶¶ 7, 9 & Exhs. A, B).

To be absolutely clear, plaintiff hereby represents that if the case proceeds in this Court, she has no intention of claiming a breach of the draft shareholder's agreement, or the violation of any rights relating to or arising out that document.  Thus, in light of the foregoing, is it difficult

15

to see how defendants can maintain that the disputes are arbitrable as arising out of the shareholder's agreement, particularly since plaintiff expressly disavows any rights or claims under such agreement, and the rights invoked in this litigation exist in exactly the same way without the alleged agreement.

In nevertheless trying to contort and distort plaintiff's claims as being "dispute[s] relating to arising out of" the draft agreement, defendants lamely offer a series of instances where the pleaded claims supposedly relate to the document.  In reality, that undertaking actually proves up our point.  First, defendants note the provision stating that Spiewak was required to "devote all of his time to the business of the Corporation." (Def. Mem. 10) Yet no one, including plaintiff in her complaint, is suggesting that Spiewak was goofing off (he was hard at work looting the company).  Nor is there a claim that the money stolen from the Company by Spiewak was a violation of the "compensation" provision of the draft agreement. Similarly, Spiewak somehow divines that the breaches of agreement asserted by plaintiff "is none other than the Shareholders' Agreement" (Def. Mem. 11), when that is simply not the case.  To the contrary, plaintiff is referring to other and much later agreements, made after David Shamah passed away in 2001, and if there is any doubt on that score, one look no further than the representation in the previous paragraph (which can be reflected in an amended pleading if necessary), as well as paragraphs 47-48 of the Amended Complaint.  Finally, the suggestion that plaintiff is complaining about authority granted to Spiewak under the purported agreement as President is also wide of the mark.  Plaintiff is relying solely on her status as a 50% owner, and whatever rights and authority (and limitations) arising under New York statutory and common law inhere in the position of a president.

In sum, nothing in the amended complaint or in this dispute relates to or arises out of the draft shareholder's agreement for purposes of deciding whether the case is subject to arbitration. Therefore, even if there is a binding arbitration agreement, arbitration cannot be compelled here.

**C.     Defendants Are Judicially Estopped From Asserting That There Is A Binding Arbitration Clause**

Even if the Court determines that Florence Shamah is subject to an arbitration obligation, and that the disputes here fall within the clause, arbitration should still be denied because Spiewak took a contrary position in the state court litigation, and prevailed in that position by obtaining judicial relief.  Accordingly, Spiewak (and in turn his co-defendants) are now judicially estopped from demanding arbitration.

"Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." New Hampshire v. Maine, 532 U.S. 742, 749 (2001).  That principle, known as "judicial estoppel," "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." Id. Judicial estoppel applies when "1) a party's later position is 'clearly inconsistent' with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel." DeRosa v. Nat'l Envelope Corp., 595 F.3d 99, 103 (2d Cir. 2010).

Here, each of elements is satisfied.  When plaintiff (mistakenly) sought to invoke the director-appointment provisions of the agreement, corporate counsel, working in Spiewak's interests, corrected her, expressly asserting that the alleged shareholder's agreement was never followed in the 40-year history of the corporation, and that it was inapplicable to the governance

17

of the entity (Matalon Dec. ¶ 5 and Exh. 13).   Consistent with that express written position,

Spiewak, in his role as President, authorized the corporation to bring an action against Isaac

Shamah (a signatory to the alleged shareholder's agreement) and against Florence (although she

was later dropped) (Shamah Dec. ¶ 15).   Surely if the agreement were enforceable, and applied

as broadly as defendants argue here, they would have been required to arbitrate.   The state court

claims against Isaac Shamah, in essence, are that he was violating the division of responsibilities

set forth in the agreement (which says that Spiewak is responsible for the day- to-day affairs of

the Company), and usurping Spiewak's role and authority as president, including the right to

decide who may or may not work in the company's offices (Shamah Dec. Exhs. D, E).

Ironically, Isaac is the *only* signer of the document on the Shamah side, and the company, at least

nominally, signed as well.   And even more ironically, it is defendants' position that there is a

single, overall dispute (Def. Mem. 4-6).   So when Spiewak wants to bring claims *against* the

Shamahs, his position is that there is no arbitration agreement, but when called upon to defend

his misconduct in connection with the same dispute (at least in his eyes), he claims there *is* such

an agreement.   Clearly, Spiewak is advocating directly contradictory positions.[6]

Second, Spiewak's no-need-to-arbitrate position, impelling the state court action, led

directly to judicial relief – a TRO and preliminary injunction against Isaac Shamah – barring

Florence's agent from, among other things, being able to access the office and keep an eye on

things for his mother's benefit (Shamah Dec. Exh. E).   So Spiewak's position led to tangible,

extraordinary judicial relief.

---

[6] It would be frivolous for Spiewak to argue that the state court action merely sought an injunction in aid of arbitration.  Not only is the state court complaint bereft of any mention of arbitration, but under CPLR 7502(c), the injunction would have become null and void, and Isaac Shamah entitled to recover attorneys' fees, by reason of the failure to commence an arbitration within 30 days of the preliminary injunction order.

18

Finally, it is obviously prejudicial to plaintiff to allow Spiewak to sustain his diametrically-opposed positions, depending on whether he is advocating at 360 Adams Street or a couple of blocks away at 225 Cadman Plaza. Among other things, Spiewak was able to kwikly obtain relief in state court, with the cost of admission nothing more than a nominal filing fee (one-half of which was effectively paid by Florence).  By contrast, if Spiewak has his way, Florence will have to spend thousands of dollars per hour just on arbitrators, not to mention the AAA's legendary filing and administrative fees.  Were this Court to endorse Spiewak's hypocrisy by compelling arbitration, that would foster the distasteful inequity that judicial estoppel is designed to thwart.

## II.

## <u>THE MOTION TO DISMISS SHOULD BE DENIED</u>

Defendants move, pre-answer, under F.R.Civ.P. 12(b)(6) to dismiss discrete causes of action for alleged failure to state a claim.  The pro-plaintiff review standard is familiar:  the allegations must be deemed to be true, and plaintiff is afforded every reasonable inference. <u>See, e.g., Sherman v. Town of Chester</u>, 752 F.3d 554, 560 (2d Cir. 2014).  The court may consider the pleading itself, together with its exhibits, documents reviewed by plaintiff in drafting the complaint, and any matter for which it may take judicial notice. <u>Kalyanaram v. Am. Ass'n of Univ. Professors</u>, 742 F.3d 42, 44 n.1 (2d Cir. 2014).

Defendants first attack the RICO counts.  They start by offering platitudes about RICO not being applicable to routine, "garden-variety" fraud claims (Def. Mem. 16-17).  Plaintiff does not quarrel with the notion that some have tried to misuse RICO to bring within its ambit brief and isolated instances of fraud, or novel theories of liability.  But that is not what is at stake here, and not what has been pled in detail.  Defendants were (and continue to be) engaged in a 20-year

pattern and practice of theft and looting of an enterprise involved in interstate commerce, featuring the creation of hundreds of phony invoices, the maintenance of false business records, the generation of fraudulent and deceptive financial statements and tax returns, the laundering of proceeds into cash, and bribery.  The amended complaint specifically identifies the various fake "vendors" (such as PMX, Basic Office Essentials, Mega Plastics, Morris Trucking, etc.), and includes copies of the damning evidence, such as the "invoices," checks and business records. The victims include Kwik Ticket, the elderly widow Florence Shamah, and the taxing authorities of the United States, the State of New York, and the City of New York.  Defendants have unabashedly corrupted a New York corporation -- and not in an isolated, "one-off" manner as they suggest.  RICO was designed to deter, punish and remedy precisely this type of conduct. The amended complaint easily states RICO claims.

Defendants take a "kitchen sink" approach to the RICO counts, claiming that plaintiff has failed to meet the pleading requirements of an enterprise, predicate acts, relatedness, continuity, and interstate commerce.  To the contrary, and as shown below, each of the RICO elements are plainly satisfied.

**A.      The Amended Complaint Pleads An
       "Enterprise" Distinct From The Corrupting "Persons"**

18 U.S.C. § 1962(c) makes it unlawful for a "person" associated with an "enterprise" to participate in the enterprise's affairs through a pattern of racketeering activity.  The statutory definition of "enterprise" specifically includes any "corporation." 18 U.S.C. § 1961(4).  The statute makes clear that the corrupting "person" and the victimized "enterprise" must be distinct from one another.  Cedric Kushner Promotions Ltd. v. King, 533 U.S. 158, 161 (2001).  And that is the case here.

In <u>King</u>, a unanimous Supreme Court reversed the Second Circuit and held that a sole shareholder and owner of a corporation, Mr. Don King (the "person") was distinct from the corporation itself, Don King Productions (the "enterprise").  "The corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status."  <u>King</u>, 533 U.S. at 163.  And that is so whether the corporate agent is acting within the scope of corporate authority, or acting outside such scope for personal ends.  <u>Id</u>. at 164.

Based on that authority, defendants' argument that plaintiff has not pled persons distinct from the enterprise is frivolous.  Larry Spiewak, a 50% owner, Malkah Jacobovits, the office manager, and Mindy Spiewak, the no-show employee, are separate and apart from the victim corporation, Kwik Ticket.  The individual defendants are the statutory "persons," and Kwik Ticket is the "enterprise."  The pleading requirement has inarguably been satisfied.

In an attempt to undermine that obvious conclusion, defendants offer a series of additional meritless points.  They say that since, in a derivative action, the corporation is ordinarily a nominal defendant, and that in a RICO case, the same entity cannot be both the RICO enterprise and the "person" accused of wrongdoing, the RICO claims here cannot proceed (Def. Mem. 18).  Of course, they cite nothing on point for the proposition that there can never be a derivative RICO action – in effect their argument – and that is surely not the case.  <u>See, e.g.</u>, <u>Bivens Gardens Office Bldg. v. Barnett Banks, Inc</u>., 140 F.3d 898, 906-07 (11th Cir. 1998) ("Because the corporation stands to gain from a shareholder's derivative suit asserting a RICO claim, the shareholder bringing the derivative claim has RICO standing if the racketeering act that forms the basis of the RICO claim was directed at the corporation."). Only by conflating independent legal principles relating to the commencement of derivative actions

21

and RICO pleading can defendants deign to make this argument.  Kwik Ticket is *aligned* as a

defendant for *diversity purposes* because, even though the derivative action is brought for its

benefit, existing management resists and opposes the action.  <u>Smith v. Sperling</u>, 354 U.S. 91

(1957); <u>ZB Holdings, Inc. v. White</u>, 144 F.R.D. 42, 45 (S.D.N.Y. 1992).  Whether it is a

"nominal" defendant for derivative purposes, or aligned as plaintiff for diversity jurisdiction,

under no circumstances can Kwik Ticket Inc. be deemed integrated with the individual

defendants for determining whether there is an enterprise distinct from the "persons."

Next, defendants argue (without relevant authority) that by stealing from the corporation,

they were engaged "in their personal interests" and therefore there is no RICO enterprise (Def.

Mem. 19-20).  The statutory requirement is that the defendants "conduct or participate, directly

or indirectly, in the conduct of such enterprises affairs" (18 U.S.C. §1962(c)).  *All* of the

extensive allegations of the Amended Complaint relate to defendants' conduct and participation

in the affairs of Kwik Ticket.  Logically, that defendants were actually stealing from and looting

the corporation does not mean that the existence of a distinct enterprise has not be pleaded.  So

this argument by defendants, too, must be rejected.

Finally, defendants complain that the Amended Complaint does not sufficiently set forth

the structure and organization of the enterprise (Def. Mem. 20).  Because RICO applies not only

to formal entities, like corporations, but also to any "group of individuals associated in fact

although not a legal entity" (18 U.S.C. § 1961(4)), when a plaintiff invokes the non-legal-entity

proviso, courts naturally require detailed allegations to establish such an enterprise independent

from the malefactors.  But a corporation is *expressly* listed as an entity that may be an enterprise

in the statute, <u>id.</u>, and it  automatically qualifies as such.  No allegations beyond the existence of

a corporation is necessary.

In any event, the allegations that Kwik Ticket is a New York corporation established in 1979 with a principal place of business in Brooklyn, which sells tagging and related supplies primarily to retail stores, with two 50% shareholders, and run solely by President Spiewak (Am. Compl. ¶¶ 9, 10, 18, 19) provides all of the allegations necessary to show the "structure and organization" of the enterprise.

**B.      Plaintiff Adequately Alleges RICO Predicate Acts**

Defendants contend that that the Amended Complaint fails to allege RICO predicate acts (Def. Mem. 21-22).  They are wrong.  As shown below, the Amended Complaint does indeed allege predicate acts within the meaning of the statute, including fraud, money laundering and bribery.  (And in the following section, we demonstrate that these acts are sufficiently related and continuous to make out a "pattern.")

The RICO statute requires a "pattern of racketeering activity," defined as two or more acts of certain enumerated offenses, including state law bribery, federal mail and wire fraud (proscribed by 18 U.S.C. §§1341 and 1343, respectively), and money laundering, in violation of 18 U.S.C. §§ 1956 or 1957.

The mail fraud statute provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

In parallel language, the wire fraud statute states:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

There can be no doubt that the allegations of the Amended Complaint set forth a scheme or artifice to defraud within the meaning of the fraud statutes, and in turn, RICO.  Illustrative is Tabas v. Tabas, 47 F.3d 1280 (3d Cir.) (en banc), cert. den., 515 U.S. 1118 (1995), a case involving a partner in a real estate firm who defrauded the estate of the other 50% partner by mischaracterizing personal expenses as business expenses and receiving compensation not permitted by the partnership agreement. Tabas, 47 F.3d at 1282-85.  The alleged mailings (41 of them) consisted of 39 distribution checks to plaintiff, and two mailings to the IRS.  In sustaining the RICO counts, the Court noted that "[e]ach time defendants misrepresented the business nature of an expense, made a questionable charge, or received compensation to which they were not entitled, they lessened the income available to the" plaintiffs. Id. at 1294.  Reversing the district court, the Court of Appeals sustained the RICO counts.

The mailing and wire elements of the statutes are merely for jurisdictional purposes, and need not themselves be fraudulent; they need only further the scheme.  Schmuck v. United States, 489 U.S. 705, 715 (1989).   The Amended Complaint expressly alleges that the use of mails and wires in furtherance of the scheme (Am. Compl. ¶ 58).  Indeed, the Amended Complaint must be read broadly, and deemed to include all reasonable inferences therefrom. Sherman v. Town of Chester, 752 F.3d 554, 560 (2d Cir. 2014). Kwik Ticket's annual tax filings – alleged to be fraudulent – could *only* have been transmitted by the mails or private interstate courier, or in electronic form in interstate commerce.  Similarly, the regular distributions to plaintiff, in amounts substantially lower had there been no fraud, were also obviously transmitted

24

by mail or by direct deposit, thereby also satisfying the jurisdictional elements of the fraud statutes.

Independently, defendants' money laundering are predicate RICO acts. Defendants' challenge to the use of money laundering offenses is based on the contention that "Plaintiff makes no allegations of an underlying 'unlawful activity' to bring the transactions within the definition of money laundering" (Def. Mem. 22). In that vein, defendants rely on law stating that the unlawful activity must be distinct from the money laundering itself. (Id.)

Significantly, however, 18 U.S.C. § 1956(c)(1) defines the phrase "some form of unlawful activity" to include "activity that constitutes a felony under State, Federal, or foreign law . . . ."

Here, independent of the money laundering are the preceding violations of the N.Y. Penal Law involving falsifying business records.

The basic violation, a misdemeanor, is set forth in N.Y. Penal Law 175.05:

> A person is guilty of falsifying business records in the second degree when, with intent to defraud, he:
>
> 1. Makes or causes a false entry in the business records of an enterprise; or
>
> 2. Alters, erases, obliterates, deletes, removes or destroys a true entry in the business records of an enterprise; or
>
> 3. Omits to make a true entry in the business records of an enterprise in violation of a duty to do so which he knows to be imposed upon him by law or by the nature of his position; or
>
> 4. Prevents the making of a true entry or causes the omission thereof in the business records of an enterprise.

That violation is enhanced to a felony "when [a person] commits the crime of falsifying business records in the second degree, and when his intent to defraud includes an intent to commit another crime or to aid or conceal the commission thereof." N.Y. Penal Law 175.10.

Here, the Amended Complaint is replete with allegations (and Exhibits) demonstrating that defendants made false business entries with fraudulent intent, for the purposes of committing additional crimes of theft, mail and wire fraud, tax evasion and commercial bribery. Accordingly, there was indeed underlying unlawful activity preceding the acts of money laundering, and money laundering may properly be alleged as RICO predicate acts.

Similarly, RICO permits state-law, felony bribery to constitute predicate acts. 18 U.S.C. §1961(1).  New York law, in Penal Law Section 180.03, a felony, provides:

> A person is guilty of commercial bribing in the first degree when he confers, or offers or agrees to confer, any benefit upon any employee, agent or fiduciary without the consent of the latter's employer or principal, with intent to influence his conduct in relation to his employer's or principal's affairs, and when the value of the benefit conferred or offered or agreed to be conferred exceeds one thousand dollars and causes economic harm to the employer or principal in an amount exceeding two hundred fifty dollars.

The Amended Complaint alleges that "defendants used some of the cash generated by their schemes to bribe buyers employed by corporate entities."  (Am. Compl. ¶ 58).  Here too the predicate RICO acts have been alleged, and plaintiff should be given an opportunity to prove up the allegations.

Finally, it is apparent that what defendants are really complaining about is not a failure to state claims or predicate acts, but the failure to provide sufficient particulars under Rule 9(b) (Def. Mem. 21).  Although plaintiff disagrees, if the Court does think there needs to be more detail, plaintiff should be given an opportunity to provide it in an amended pleading, it being obvious that her RICO claims are not futile, but well founded.

**C.**   **The Pleaded Predicate Acts Are Related And Satisfy The Continuity Requirement**

Since RICO requires a "pattern" of racketeering activity," predicate acts that are isolated in time and different in type do not satisfy that requirement.  See H.J. Inc. v. Northwest Bell Tel.

Co., 492 U.S. 229, 239 (1989).  Astonishingly, defendants argue that the alleged acts here are

"one-off" incidents and therefore do not satisfy the relatedness requirement (Def. Mem. 24).

Perhaps even more amazingly, defendants characterize the allegations against them as having

"occurred on an irregular basis, and were isolated and sporadic events."  (Def. Mem. 26).  It

seems as if defendants are reading the complaint from a different case.

Plaintiff does not challenge defendants' exposition of the law on the standards for

relatedness (Def. Mem. 23).  We agree that predicate acts are related, as stated by the Supreme

Court, when they have "same or similar purposes, results, participants, victims, methods of

commission, *or* otherwise are interrelated by distinguishing characteristics and are not isolated

events."  H.J. Inc., 492 U.S. at 239.  Although framed in the disjunctive – and thus any one of the

types of relatedness would suffice – here each and every one of them are established.

The Amended Complaint alleges that for 20 years, defendants adopted a pattern and

practice whereby phony invoices were produced in-house, recorded on the books as legitimate

transactions, checks were drawn to cash for the "payment" of these invoices, and the office

manager would go to the bank, withdraw the funds in U.S. currency, and then divvy up the cash

(Am. Compl. ¶¶ 27-37).  Separately, and also for decades, the Spiewaks would charge all of their

personal expenses on credit cards issued to the company and to the defendants individually, and

pay those credit cards in full, each month, with company money (Am. Compl. ¶ 38).  The

transactions were not treated as distributions or income, but rather as legitimate business

expenses such as "Office Expenses," "Purchases," and "Auto" (Am. Compl. ¶ 38).   These

fraudulent schemes encompassed hundreds if not thousands of individual transactions amounting

to millions of dollars of theft (Am. Compl ¶ 38).  The purposes of these acts were the same: to

enrich defendants at the expense of the other 50% owner, and evade income taxes.  The results of

these acts were the same; the participants were identical (and did not even shift over time); the victims – Kwik Ticket, and derivatively Florence Shamah, together with at least three taxing authorities, remained constant.  Too, the methods of commission and distinguishing characteristics were identical.  Far from being unrelated, the allegations here are a textbook example of related acts that make out a "pattern."

Even were the elements reduced to the more atomic level of "vertical" and "horizontal" relatedness, those constituents are present.  The acts are certainly "vertically related," both because of defendants' positions within the organization and their control thereof, and as well as the fact that the acts are related to the activities of the enterprise – the definitions advocated by defendants (Def. Mem. 23).  Similarly, horizontal relatedness is present, even under defendants' own definition, because each predicate act "is related to the enterprise."  (Def. Mem. 23).  In short, the relatedness requirement is overwhelmingly present.

Similarly, easily established is the continuity factor.  That is basically a time element designed to foster the statutory language requiring a "pattern" of predicate acts.  H.J. Inc., 492 U.S. at 240.  It can be satisfied by showing a "closed-ended" period of conduct which extended over a substantial period, or "open ended" conduct which presents a risk of continuing harm.  Id. at 241. Both are present here.

As to closed-ended conduct, defendants can argue that plaintiff has pled only two years' of misconduct and fraud (Def. Mem. 25) only by ignoring express allegations in the amended complaint and the exhibits thereto.  Plaintiff has specifically alleged that the predicate acts stretch back nearly two decades ago.  Annexed to the complaint as Exhibit J are phony invoices involving Blanca Cleanings, and non-existing bi-weekly carpet cleaning, dating back to 2013, including the checks dated 2013 in payment of the supposed invoices.  Such fraud preceded and

28

succeeded 2013 by many *years*.  That is manifestly a "substantial period" meeting the continuity requirement.

Similarly, open-ended continuity exists by virtue of the risk of repetition.  To assuage plaintiff's charges of misconduct, in September 2019 Spiewak agreed to a written corporate resolution whereby checks could not be written to cash, and Isaac Shamah could work in the company's offices (Am. Compl. ¶ 40 & Exh. M).  Lo and behold, under the watchful eye of Mr. Shamah, the phantom "vendors" suddenly stopped doing business with Kwik Ticket (Am. Compl. ¶ 41).  Plaintiff alleges that, frustrated with Mr. Shamah's oversight, they obtained a preliminary injunction barring Mr. Shamah from the offices (Am. Compl. ¶ 44).  No longer bridled by Shamah supervision, the complaint alleges that the fraudulent conduct has resumed (Am. Compl. ¶ 45), thereby pleading open-ended continuity.  In short, then, the acts complained of were not sporadic and infrequent, but regular, extensive, and continuing over a lengthy period. There is sufficient continuity to establish a pattern.

**D.   Defendants Misconstrue The Commerce Requirement**

The federal RICO statute applies to any enterprise "engaged in, or the activities of which affect, interstate or foreign commerce" (18 U.S.C. § 1962(c)).   There is no dispute that *Kwik Ticket*, with reported sales of $7 million annually (Am. Compl. ¶ 21) and which does business with entities throughout the country (see, e.g. Am. Compl. Exh. A) is engaged in and affects interstate commerce.  See United States v. Robertson, 514 U.S. 669, 672 (1995).   Instead of focusing on that jurisdictional requirement, defendants instead mistakenly focus on their New York residences, and the situs of the *fraudulent* activities (Def. Mem. 27).  That is not the test, nor do defendants cite anything in support thereof.  The jurisdictional hook is whether the enterprise itself is engaged in interstate commerce.  United States v. Dickens, 695 F.2d 765, 781

29

(3d Cir. 1982) ("The enterprise, not the individual defendant, must be engaged in or affecting interstate commerce."). Since the pleadings and all reasonable inferences therefrom establish that Kwik Ticket is engaged in commerce, and defendants do not suggest otherwise, jurisdiction has properly been alleged.

**E.    The Amended Complaint Adequately Pleads**
       **<u>Violation Of The RICO Conspiracy Statute</u>**

 In simple, straightforward language, 18 U.S.C. 1962(d) makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  The evil sought to be proscribed is the *agreement* to engage in conduct violative of RICO.  Contrary to defendants' argument, it is not necessary that there be an underlying substantive violation.

The Supreme Court considered the question in <u>Salinas v. United States</u>, 522 U.S. 52 (1997).  The Court unanimously held: "There is no requirement of some overt act or specific act in the statute before us, unlike the general conspiracy provision applicable to federal crimes, which requires that at least one of the conspirators have committed an 'act to effect the object of the conspiracy'  [18 U.S.C.] § 371. The RICO conspiracy provision, then, is even more comprehensive than the general conspiracy offense in § 371." <u>Id.</u> at 65. Accordingly, in sustaining a criminal conviction, the Court concluded "[t]he interplay between subsections (c) and (d) does not permit us to excuse from the reach of the conspiracy provision an actor who does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense." <u>Id.</u> at 65.

That has necessarily become the law in the Second Circuit.  In <u>United States v. Applins</u>, 637 F.3d 59, 81 (2d Cir. 2011), the Second Circuit echoed that "[n]either overt acts, nor specific predicate acts that the defendant agreed personally to commit, need be alleged or proven for a §

1962(d) offense (internal quotation marks and citation omitted).  See also United States v. Pirk, 2018 U.S. Dist. LEXIS 213787, *26 (W.D.N.Y. Dec. 19, 2018) (proof of a RICO enterprise is not an element of proving a RICO conspiracy).  In arguing that the dismissal of Count I automatically requires dismissal of Count II, defendants rely on outdated Second Circuit law (Def. Mem. 27).  Since there is no merit to the sole argument advanced by defendants for dismissal of the RICO conspiracy charge, Count II should not be dismissed, even if Count I is.

**F.     The Amended Complaint Readily Pleads Conversion**

Under New York law, "conversion is an unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights. (Employers' Fire Ins. Co. v.  Cotten, 245 NY 102, 105.) Money, if specifically identifiable, may be the subject of a conversion action (Independence Discount Corp. v Bressner, 47 AD2d 756, 757; Laurent v Williamsburgh Sav. Bank, 28 Misc 2d 140, 144; 10 NY Jur, Conversion, §§ 5, 13)." Peters Griffin Woodward, Inc. v WCSC, Inc., 88 A.D.2d 883, 883-84 (1st Dept. 1982).

Defendants' principal challenge to the conversion count appears to be the idea that the money they stole cannot qualify as "property" for purposes of a conversion claim (Def. Mem. 28).  While damages for breach of contract, for example, would not qualify as property, when money is improperly taken from an identifiable bank account, it qualifies as "property" subject to conversion.

On point is the Appellate Division decision in Payne v. White, 101 A.D.2d 975, 976 (3d Dept. 1984), which reinstated a conversion action dismissed by the trial court on the grounds that the funds in question were not sufficiently identifiable.  But the alleged converted funds came from an identified joint bank account.  The Court held:

"[M]oney can be the subject of a conversion action when it can be identified and segregated as a chattel can be (citing Marine Midland Bank v Russo Produce Co.,

31

> 65 AD2d 950, 952, mod 50 NY2d 31). In the instant matter, the funds in question
> were clearly identifiable as the proceeds of a specific named bank
> account. Accordingly, Special Term's reasoning is erroneous. Conversion causes
> of action have been unhesitatingly recognized in cases involving the unauthorized
> withdrawal of more than his share of the funds from a joint account by a
> cotenant."

Here, too, the funds stolen by defendants came from a specifically identifiable bank account. The funds in the bank account belonged to Kwik Ticket, but defendants converted the funds by writing checks to "cash," and then took the money. Indeed, some of the offending checks (with the bank account number appropriately redacted) are exhibits to the Amended Complaint. Similarly, the Amended Complaint alleges that defendants improperly drew funds from Kwik Ticket's bank account to pay for an enormous amount of personal expenses on credit cards. Accordingly, the conversion count should not be dismissed on the grounds that it fails to state a claim.

**G.    The Count Seeking A Permanent Injunction Should Not Be Dismissed**

In Count XII, plaintiff seeks a permanent injunction enjoining defendants from engaging in fraudulent conduct against the Company or taking any actions that are not properly authorized. It is permissible to plead a cause of action for a permanent injunction, even though such remedy relates to substantive claims set forth elsewhere in the complaint. Corsello v. Verizon NY, Inc., 77 A.D.3d 344, 368 (2d Dept. 2010), aff'd as modif., 18 N.Y.3d 777 (2012).

. A cause of action for a permanent injunction is sufficiently pleaded when there is a violation of a right presently occurring, threatened or imminent; an inadequate remedy at law; serious and irreparable injury will result of the injunction is not granted; and equities in plaintiff's favor. Elow v. Svenningsen, 58 A.D.3d 674, 675 (2d Dept. 2009). Here, all of the elements are present, and thus the cause of action should not be dismissed.

Defendants wrongly argue that the finding of an adequate remedy at law in connection with plaintiff's preliminary injunction motion dooms the count for a permanent injunction (Def. Mem. 29-30).  But findings by a court on a preliminary injunction motion are not binding at trial.  University of Tex. v. Camenisch, 451 U.S. 390, 395 (1981).  At a subsequent trial, the merits of the cause of action may be re-examined.  Irish Lesbian & Gay Org. v. Giuliani, 143 F.3d 638, 644 (2d Cir. 1998).  Hence, there is no basis for a dismissal of Count XII at this juncture.

### III.

### SPIEWAK'S OFFENSIVE COMMENTS ARE RELEVANT AND SHOULD NOT BE STRICKEN UNDER RULE 12(f)

Defendants falsely claim that the "sole and express purpose" of the amended complaint was to "shame" Mr. Spiewak by including excerpts from two recordings made by an employee without his knowledge (Def. Mem. 31).  In fact, the complaint was amended to account for developments which occurred after the original complaint was filed, including a series of direct claims by plaintiff against defendants.  One of the new derivative claims seeks to require Spiewak to reimburse Kwik Ticket for all expenses and losses arising out of the recent settlement of a claim of hostile-environment discrimination leveled by a former employee, on the grounds that it was solely Spiewak's misconduct which led to the employee's charges (see Count XI). Significantly, Spiewak does not seek dismissal of the count, or suggest that it fails to state a claim.  Rather, he is allegedly miffed about the *way* in which the claim was pled.  However, the allegations are directly relevant to the cause of action, and should not be stricken under Rule 12(f).

"Unless it is obvious that portions of the pleadings 'sought to be struck [have] no bearing

on the subject matter of the litigation and that [their] inclusion will prejudice the defendant, the

complaint should remain intact.'"  Moy v. Adelphi Inst., 866 F.  Supp. 696, 709 (E.D.N.Y. 1994)

(citation omitted).  The Second Circuit has cautioned that evidentiary questions should be

avoided at the outset of the litigation, and that admissibility and relevancy should be deferred

until trial, not decided on a motion to strike. Lipsky v. Commonwealth United Corp., 551 F.2d

887, 893 (2d Cir. 1976).  As one court aptly put it, "[t]he facts here may be unpleasant for

plaintiff to have on the record and they certainly contain charges of reprehensible conduct but the

same is true of many facts of life which are entitled to be pleaded as relevant to a cause of action

or a defense. Such, for example, are the facts concerning a divorce for adultery. These may be

scandalous and annoying and prejudicial to the accused party but plaintiff or defendant is

certainly entitled to plead them." Gateway Bottling, Inc. v Dad's Rootbeer Co., 53 F.R.D. 585,

588 (W.D. Pa. 1971).

The amended complaint contains a transcript of two relevant conversations initiated by

Spiewak.  The first conversation is a tasteless impersonation of an African-American man

bragging about his genitalia and sexual prowess.  Spiewak's adoption of an African-American

persona is evident only on the tape, not the transcript, and thus the audio is relevant.   The second

is between Spiewak and a mentally-impaired individual, in the presence of other employees,

about a certain employee named "Fortune" performing fellatio on the man.   The halting affect of

the impaired man does not come through on the transcript, but can be discerned on the tape.   A

paraphrase of Spiewak's own Memorandum of Law is appropriate here: "This type of practice is

an abuse of [Kwik Ticket and its employees], and has no place in the Eastern District." (Def.

Mem. 31) (As noted, the ECF system does not provide for filing of audio files, so the tapes were

uploaded to another publicly-accessible forum, YouTube.  However, one needs the URL

disclosed in the Amended Complaint to access the tapes; they are not available to someone doing

a YouTube search.)

 The allegations and exhibits which Spiewak wants stricken are obviously related to the

cause of action.  Moreover, at this juncture, the Court is not in a position to determine its

admissibility, and should heed the Circuit's advice not to do so.  And finally, Spiewak does not

even try to articulate prejudice.

 So the Rule 12(f) branch of the motion should be denied.


## CONCLUSION

 For the foregoing reasons, defendants' motion should be denied in its entirety.


**M A T A L O N PLLC**

By: *s/ Joseph Lee Matalon*
  Joseph Lee Matalon
450 Seventh Avenue, 33rd Floor
New York, New York 10123
(212) 244-9000
 *Attorneys for Plaintiff*
 *Kwik Ticket Inc., by its 50% owner,*
 *Florence Shamah*

Dated:  September 23, 2021